WEGMANN REALTY COMPANY, a Corporation, Appellant, v. CITY OF ST. LOUIS, a Municipal Corporation; E. R. KINSEY, President of the Board of Public Service of the City of St. Louis; ROBERT B. BROOKS, EDWARD A. STEININGER, JOHN L. PRITCHARD and HARRY L. SALISBURY, Members of and Constituting the Board of Public Service of the City of St. Louis, Missouri, and TRINIDAD ASPHALT MANUFACTURING COMPANY, a Corporation.—47 S. W. (2d) 770.

Court en Banc, March 5, 1932.

*Kinealy & Kinealy* and *Barth & Baron* for appellant.

974

*Julius T. Muench, Oliver Senti, Foristel, Mudd, Blair & Habenicht* and *Jourdan & English* for respondents.

FRANK, J.—Action by plaintiff, appellant here, to enjoin the city of St. Louis, the members of its Board of Public Service and the Trinidad Asphalt Manufacturing Company, a contractor, from proceeding further with the performance of a contract for the improvement of certain described parts of Kingshighway with an asphalt pavement, which said contract had theretofore been duly awarded to said contractor. The grounds on which plaintiff sought to enjoin the improvement are that the detailed plans and specifications for such improvement required that the asphalt to be laid on the street should be mixed with a sealed rotary mixer, having appliances for adding the asphaltic cement in the form of a spray under high pressure to the sand and gravel and other elements of the asphalt mixture. It is alleged that one Finley has a patent on such a type of mixer and that no contractor could comply with the specifications unless he was licensed under the patents of Finley, although other mixers would do equally as good work and would comply with the specifications as to results to be obtained. It is further alleged that the specifying of the use of a sealed rotary mixer was an indirect way of requiring the use of a mixer and method patented by said Finley, all of which resulted in the stifling of competitive bidding and amounted to an arbitrary, oppressive and unlawful action on the part of the Board of Public Service and a fraud upon plaintiff and all persons owning property in the taxing district.

Plaintiff owns property in the taxpaying district and it is claimed the completion of the improvement and the issuance of tax bills to pay therefor would cast a cloud on plaintiff's title.

On September 28, 1931, the court ordered that defendants appear and show cause why a temporary injunction should not issue. A restraining order was issued pending a hearing on the order to show cause. On November 12, 1931, defendants made separate returns to the order to show cause and filed separate answers to the merits, to which plaintiff replied. A trial on the merits began on November 12, and was concluded on November 16, 1931. On November 20, 1931, the court rendered a decree dismissing plaintiff's petition, denying the permanent injunction prayed for and dissolving the temporary restraining order theretofore issued. Plaintiff appealed.

The sole question in the case is whether or not the Board of Public Service had a lawful right to provide in the detailed specifications for the improvement that the asphalt to be used therein should be mixed with a sealed rotary mixer as heretofore described. The pleadings are not assailed and they sufficiently present that question.

It appears from the evidence that for many years the mixer used in the mixing of asphalt is what is commonly called a pug mill mixer. Likewise for many years the specifications for asphalt paving in the city of St. Louis specified the use of the pug mill mixer. In the years 1929 and 1930 the Board of Public Service specified the use of either the pug mill mixer or the sealed rotary mixer and observed the character of work done by each mixer. After these observations were made, the Board of Public Service, on April 10, 1931, held an open hearing on the merits of rotary-mixed asphalt specifications. All asphalt contractors in the city, bankers who buy street paving tax bills, attorneys who pass on the validity of tax bills and the representative of the Municipal Research Bureau which looks after the interest of taxpayers, were invited to be present. The chairman of the board opened the meeting with the following statement:

"Gentlemen, as you know, this conference has been called—we expected to get certain changes in the specifications for mixing the asphalt material entering into the wearing surface of asphalt pavements. Not a suggested change as to material, but simply a method of mixing the material commonly used for this purpose. It has been claimed that the method suggested, with which I think you are familiar, is superior. So superior, in fact, that the City ought to adopt it for all of its paving. A suggested method is one of mixing in a rotary mixer what is commonly known as the Fin-Mix process, of which there are two plants in St. Louis.

"Now, the Board wants to ascertain, through this kind of a conference, a number of points. We want to find out whether or not, as a matter of common knowledge among those familiar with paving

in St. Louis, whether as a matter of common knowledge or common belief, this is a superior process. The Board feels that if the men engaged in the industry disagree on the question, that that is a sufficient gauge for us as to what is common knowledge with respect to that type of pavement.

"There are nine plants in St. Louis of various sizes and kinds. Two of the nine are now ready, equipped to mix the asphalt mixture in accord with the suggested specifications. The other seven are not. The Board has no desire, in fact it has every desire not to work any hardship on any contractor engaged in the paving business here, and therefore, we particularly want an expression from those who could not, with their present plants, comply with the proposed specifications."

The chairman of the board testified that all contractors present stated that the sealed rotary process was superior and would reduce the price of asphalt to the contractor, and on work in which the rotary mixer was specified they would be free to bid independently and competitively with other bidders; that upon receiving this information from the contractors the board cut the estimate of cost lower than the bid price which had prevailed prior to the adoption of the present specifications, and the cost of asphalt pavement to the taxpayer is now less than it was just prior thereto under the old specifications. He further testified that the board had the right to reject any and all bids. The chairman of the board also testified:

"I said then, and I say now: 'The Board does not want to adopt the specification, even though it seems to give us a better output, if it is going to work a hardship on any of the other plants in the city. We don't want to put anybody out of business. Don't want to do something that will make paving more costly to the taxpayer. We don't want to do something that will restrict competition. And that is the reason we are asking these questions.' Following that, one of the contractors intimated that while he was at that time in position to bid freely and competitively on the work, that possibly the conditions might change—and in answer to that—speaking for the Board—I made this statement: 'To make myself plain, your statement is that at the present time you believe you would be free to bid independently. I repeat my statement that if the adoption of this specification should work out differently in the future, and you find yourself unable to bid competitively, the Board still has control of this situation by changing right back to the old specifications.' In other words, the matter is entirely in the hands of the Board. As long as we get a better product at a cheaper price we feel that we have exercised good, sound business judgment. If conditions develop that we can get a better product at what we believe a reasonable price, we can, of course, change."

After observing and comparing the work done by both a sealed rotary mixer and the pug mill mixer for a period of two years, and after holding the open hearing on the merits of the sealed rotary mixer, the board adopted the specifications in question which provide for the use of the sealed rotary mixer. Of course what occurred at this open meeting is not conclusive on the taxpayer. Neither does it, standing alone, determine the right of the board to specify the use of the sealed rotary mixer, but it is competent evidence in the case as tending to show whether or not the board acted fraudulently or in good faith. Asphalt streets are composed of a mixture of asphaltic cement with other materials. All parties agree that in the construction of an asphalt street it is highly important that the asphaltic cement and other materials used should be thoroughly and uniformly mixed and of uniform temperature at the time it is placed upon the street. If not of uniform temperature the heavy steam roller that is used in laying the material on the street, will exert a greater compression upon some parts of the material than upon other parts because of the difference in temperature. If the materials are not thoroughly and uniformly mixed some parts will be too rich with asphaltic material while others will be too lean, the result of which will be disintegration in the pavement. The lack of uniformity will cause a rolling or waving of the street. Soft spots will occur, which are more susceptible to wear, and lean spots will allow moisture to seep into the pavement and cause a disintegration. For these reasons all engineers and experts testifying for both parties agree that the materials composing the pavement should be thoroughly and uniformly mixed.

Plaintiff does not claim that the sealed rotary mixer which was specified for the work in question will not produce a uniformly mixed product. The contention is that the pug mill mixer will do the same things and for that reason the act of the Board of Public Service in specifying the sealed rotary mixer only, was arbitrary and unlawful, prevented competitive bidding and amounted to a fraud upon plaintiff and other property owners. On the other hand, defendants' contention is that the sealed rotary mixer is superior to the pug mill and other mixers and will produce a superior mixture at less cost to the contractor and to the taxpayers.

Both parties offered expert testimony on this question. Many pages of the record are used in showing the qualifications of these experts. Present purposes will be served by stating that they were shown to be sufficiently qualified to speak on the subject.

Prevost Hubbard, one of plaintiff's experts described a pug mill mixer as consisting of a semi-cylindrical metal box through which passes two shafts revolving in opposite directions and carrying blades so shaped and set as to effectively mix various combinations of

mineral aggregate and asphaltic cement; that the blades are so arranged as to bring the mixture to the center of the box; that the turning of the shaft causes the paddles to revolve and causes great agitation in the mixing box; that when properly operated the pug mill mixer produces a very uniformly mixed product; that some of the mixers are equipped with steam jackets to prevent the cooling of the mixture when coming in contact with the sides of the mixer; that the procedure is to first mix the sand, stone and dust in the mixer, then add the asphaltic cement. This witness further testified that he would not attempt to qualify as an expert on the details of the design of the Finley mixer, but that he had witnessed the operation of a Finley mixer and studied the output for the purpose of informing the Technical Committee of the Asphalt Institute as to .the advisability of including that type of mixer in specifications for asphaltic pavement issued by the Asphaltic Institute; that prior to this time the specifications issued by the Institute limited the process of mixing to the use of the pug mill mixer; that after examining the output of the Finley mixer he found it to be in all respects equal to the product of the pug mill mixer and now the Asphaltic Institute specifies and recommends the use of both the Finley and the pug mill mixer on an equal basis. This witness further testified that the impregnation of the materials with asphaltic cement was approximately the same in a pug mill mixer as in a Finley mixer so far as practical considerations were concerned; that in preparing a paving mixture we do not basically attempt to impregnate the mineral, but merely to coat it with an adhesive coating; that the bulk of most sheet asphalt paving containing approximately 75 per cent of clean quartz and sand, which is impervious to impregnation, illustrates the point that impregnation in itself is not an essential to satisfactory service of paving mixtures; that in his judgment as good paving can be produced with a pug mill mixer as with a Finley mixer.

Two other witnesses, T. Warren Allen and James W. Howard who were qualified as experts testified that they were familiar with the output of both the Finley and the pug mill mixer and that the pug mill mixer would produce as uniform a mixture as a Finley mixer. Witness Howard testified that either mixer would make a pavement substantially equivalent to the other and that both were within the specifications of the city of St. Louis. Howard further testified that he made a test of samples from the Asphalt Paving Company of St. Louis, mixed in the pug mill mixer, and found they complied with the specifications for the city of St. Louis for the resultant product to be obtained from those specifications for the year 1931. B. N. Shanaker, foreman of the city repair plant testifying for plaintiff said that by careful attention he was able to get good mixture with a pug mill mixer. Another witness for plaintiff, Mark Thompson,

asphalt engineer for the city, testified that in his opinion as an expert engineer, the rotary mixer is the better mixer.

Allen R. Dow, an expert, testified on behalf of defendant as follows:

That he had made thousands of tests of asphalt mixed in a pug mill mixer, that the greatest difficulty is in the lack of· uniformity in the mixture; that the mixing is done by men who empty the material into the mixer; that the asphalt is emptied into the mixer from a bucket and if the bucket is tipped one way or the other, more asphalt goes in one end of the mixer than in the other; that great care must be used to see that the asphalt is uniformly distributed in the mixer in order to get a uniform result; that it would be possible to distribute the asphalt uniformly in the mixer but considering the class·of laborers that usually perform this work and the conditions under which they work, it is very difficult for them to make each batch alike; that on the platform where these laborers work there is a dry two scale heat, a temperature of over three hundred degrees; that when the limestone dust is thrown into the mixer it creates a dust so thick that it is impossible to see across the platform on which the laborers work; that the average amount of one mixture is about one thousand pounds; that the time consumed in. mixing one batch is two and one-half minutes; that each batch when mixed is dumped into a truck at a temperature of approximately three hundred twenty-five; that it requires ten batches to fill the truck; that the truck stands for twenty-five minutes while being filled, the result of which is ten different temperatures of material in a truck load.

This witness further testified that the blades in a pug mi'l mixer do not touch the bottom of the mixer, the result of which is to leave some of the material lying in the bottom unmixed, that the blades do not come close to the ends of the mixer which leaves unmixed material in the four corners of the mixer, the result of which is a mixture which is not uniform; that he was familiar with the rotary type mixer in a sealed container or drum.in which the asphalt is added under pressure; that he saw the rotary type mixer in St. Louis; that inside the drum were a series of blades which throw the mixture from the center to the sides, and as the drum revolves the material slides downward from one blade to another; that the revolving motion of the drum could not help but make a perfect mixture; that the effect of putting the asphalt in under pressure is to drive the cement into the pores of the aggregate, filling up all cracks and giving the asphalt a firm hold on the surface of the grains, both sand grains and stone particles; that every part of the mixture is thoroughly impregnated with asphalt; that the mixture obtained from a rotary mixture made under pressure is superior to mixture from a pug mill mixer because the particles are impregnated with asphalt cement; that in the pug mill type the particles on the surface of the material are merely coated and not impregnated with the asphalt; that im-

pregnation makes a better adhesion for the mineral particles and prevents the asphalt from wearing off the mineral particles, the result of which is a very must better asphalt; that there is not much chance for a bad mixture with a rotary mixer unless the material is incorrectly weighed into the mixer; that in his opinion the mixture obtained from a rotary mixer which puts the asphaltic cement in the mixture under pressure is superior to any mixture that can be made by use of the pug mill mixer; that he had made many analyses of material from both the rotary and the pug mill mixer and found the mixture from the rotary mixer remarkably uniform while that from the pug mill mixer was not; that in his judgment more defects in asphalt pavement result from lack of uniformity of the mixture than from any other cause.

This witness further said that in his judgment the rotary mixer could be operated at less cost than the pug mill mixer. He testified that it would require a fewer number of men and trucks to do the same amount of work for the reason that a rotary mixer mixed a truck load of seven tons at one mixing in from six to eight minutes, while with the usual sized pug mill mixer it would require several mixings and much more time to fill the truck.

Three other experts who were familiar with both mixers testified that the sealed rotary mixer was decidedly superior to the pug mill mixer. E. R. Kinsey, President of the Board of Public Service testified that after trying out the sealed rotary mixer for a year or two the board was convinced that it would produce a superior pavement at less cost to the taxpayer, and for these reasons and no other, they specified its use in the construction of asphalt pavements. J. C. Heman, President of the Trinidad Asphalt Company, owner of an asphalt plant which was equipped with a pug mill mixer, testified that it was not possible to get a uniform mixture from a pug mill mixer; that he went to the rotary mixer because it would make a superior street at less cost. O. S. Brighton, President of Central Paving Company, a man of many years experience in street paving work testified that the rotary mixer was much superior to the pug mill mixer; that regardless of the manner in which materials are put into the rotary mixer, it will mix them thoroughly and uniformly.

C. L. Newbold, vice-president of the National Fin-Mix Corporation testified that no contractor could buy a Finley sealed rotary mixer, but any reputable contractor could lease one for twenty-five cents per ton of materials mixed; that no one who desired to lease a mixer had been refused; that he informed the Board of Public Service that his company would lease a mixer to any reputable contractor. He further testified that he thought the rotary mixer was the greatest step forward in the asphalt industry in the last twenty-five years.

Plaintiff introduced in evidence a report containing a summary of the results obtained by a study and analyses of samples taken from each plant doing asphalt paving in the city during the years of 1928, 1929 and 1930. This study was made by the Board of Public Service and the report thereof was filed in the office of its president. Plaintiff contends that this report shows that the work of the rotary mixer was not superior to that done by the pug mill mixer, and as the board knew that fact at the time it specified the rotary mixer, its act in so doing prevented competition and was arbitrary and fraudulent.

It does not appear from this report that the samples were taken from different parts of the mixture and a comparison of the samples made in order to determine whether or not the mixture was uniform. Mr. Kinsey, president of the board, testified that this investigation and report was made for the purpose of rating their own inspectors and employees. He further testified, "If we had been desirous of making a careful survey of the results of the mixture in the plants and mixing operations, we would have needed to exercise far more care in the sampling. For example, there is only one sample in one plant, or one class of work, in every case, more or less. But there is no relation whatever between the tonnage handled in the plants and the number of samples taken. In other words, the reports on which this tabulation was made would not be the same character of reports that we would need to have if we were making an investigation of the results of these plants in each year. The purpose was quite different. . . . We would have had to prepare for it earlier in the year and taken samples in number and character and at such times that would give us the data necessary to reach the other conclusion."

Mr. Thompson, city asphalt engineer, testified that the figures in the report simply show small samples taken from the middle or sides of the truck; that no notice was taken of the difference between three or four samples taken from different parts of the same load; that the report does not show the facts an engineer would need in order to determine whether or not the mixture was uniform.

Plaintiff contends that defendants' witness Green testified that there was a rotary mixer on the market other than the Finley mixer, the name of which he did not recall, which would produce as good and as uniform a mixture as the Finley sealed rotary mixer.

We do not so read the record. Green testified that this unnamed rotary mixer was the same as the Blake process. Concerning the Blake process, he testified:

"Q. In your opinion, over a long run would the Blake mixer turn out as uniform a product as the Finley mixer you have seen here in St. Louis? A. If the materials were introduced in there so that they came in there all the time, yes.

"Q. You think it would be practically impossible? A. Yes.

"Q. Mr. Baron asked you about smoothing out materials. Is that practical from a commercial standpoint? A. No.

"Q. What would happen if a contractor attempted to do that? A. He would go broke."

Viewing the evidence of this witness as a whole, what he did say is that the unnamed mixer could be made to produce as uniform a mixture as the Finley rotary mixer, if time enough were taken to smooth out or evenly distribute the materials in the mixer, but such a process was practically impossible and wholly impractical from a commercial standpoint.

Further contention is made that defendants' witness Van Trump testified that as uniform mixture could be obtained with the Blake rotary mixer as with the Finley mixer. A single answer of the witness, divorced from the remainder of this testimony might support plaintiff's contention, but his evidence taken as a whole does not. The witness testified that back in 1914 he examined samples of individual batches taken from a Blake mixer and they checked fairly close with samples examined from the Finley mixer.

"Q. You say fairly close. A. I mean they checked fairly close with that weighed in at the time at the St. Louis plant.

"Q. Now, did those results show that you could obtain by using the Blake mixer, to the same degree, as uniform a mixture as you could by use of the Finley mixer? A. I think so.

"Q. All right, what necessitated these improvements that were made over the Finley mixer in the last few years? A. They discovered that they could improve the uniformity of the mixture by making these improvements.

"Q. The variance of the product obtained by use of the Blake mixer was much greater than the variance of the product obtained by use of the Finley mixer, considering the design at zero point? A. I mean to say that I consider material from the Finley mixer here in St. Louis was greatly superior to that obtained at the Blake plant back in 1914.

"Q. That may be due to the formula used? A. I think due to the fact that this Finley mixer today has been designed and improved until it is a high-class instrument."

The record shows there were four bids for the work in question and the bid of defendant Trinidad Asphalt Manufacturing Company was the lowest and best bid.

Plaintiff contends that every witness who had done or supervised paving work in the City of St. Louis testified that by use of the pug mill mixer they had obtained the results prescribed by the specifications which provided the same character of mixture as is provided by the specifications in the instant case. It is claimed that Thompson,

city asphalt engineer, Heman, President of the Trinidad Asphalt Manufacturing Company and Newbold, vice-president of the National Fin-Mix Company so testified.

From this contention it is argued that the testimony of these witnesses show that the pug mill mixer produces a mixture equal to that produced by the rotary mixer. The record of the testimony of these witnesses does not support plaintiff's contention. Some isolated statements of the witnesses, disconnected from the remainder of their testimony on the subject might lend color to plaintiff's claim. But their entire testimony reveals the fact that in their judgment the sealed rotary mixer is far superior to the pug mill mixer and produces a better pavement. For example, Thompson testified that the materials were poured from a bucket by hand into the pug mill mixer; that in this pouring process, if the materials were not distributed evenly throughout the length and breadth of the mixer, the mixture would not be uniform; that they had trouble to get a uniform mixture with the pug mill mixer; that due to the type of men that do this work and the cloud of dust and dirt in which they had to work, it was very hard to get them to dump the material evenly into the mixer; that in his judgment the rotary mixer was the nearest to perfection he had seen in that line, and produced the best mixture they ever had. Heman, a paving contractor who had used the pug mill mixer testified that it was not possible to get a uniform mixture from a pug mill mixer; that he changed to the rotary mixer because it produced a better street at a less cost. Newbold testified that there is as much difference between a rotary mixer and pug mill mixer as there is between a horse and buggy and an automobile as a means of transportation; that the rotary mixer is the greatest step in the asphalt industry in the last twenty-five years.

The chancellor found, among others, the following facts:

"The Board of Public Service found and determined in good faith that asphaltic pavements, the ingredients of which were mixed by the kind of machine and method specified, were superior pavements and cost less to produce than if produced by process theretofore in use, and the said Board of Public Service, acting in good faith and in the exercise of the discretion reposed in it by the Charter of the City of St. Louis, Missouri, ordered that such machine and such method should be used in the manufacture of the asphalt to be laid on Kingshighway Northwest from West Florissant avenue to Halls Ferry Circle.

"The court further finds and determines from the evidence and the proof adduced that a sealed rotary mixer with an appliance for the adding of asphaltic cement under high pressure in the experience of those engaged in the business of making and laying asphalt pavements and in the experience of those well versed in the trade is a

superior product and produces a better pavement than any other known process in existence at this time."

"The court finds that there was no fraud or bad faith in the letting of the contract in question and that the Board of Public Service of the City of St. Louis, in adopting the specifications, acted in good faith."

In equity cases it is our province to weigh the evidence and make our own finding of facts. But where, as here, practically all of the evidence is oral, the chancellor who saw and heard the witnesses was in a better position to determine what weight and credit should be given to their testimony, than we are from a reading of the printed record. In this situation we are at liberty to defer somewhat to the finding of the chancellor and refuse to disturb that finding unless we are satisfied it is against the weight of the evidence. From a review of the whole record we are not convinced that the finding of facts made below was against the weight of the evidence. Having reached this conclusion, the remaining question is whether or not the Board of Public Service had a lawful right to specify that the asphalt used in the improvement should be mixed in a sealed rotary mixer such as heretofore described.

The evidence shows that the Finley rotary mixer as well as a method for preparing bituminous cement aggregate composition mixed with a mixer answering the description of the Finley mixer were patented. The specifications did not require the contractor to use the Finley mixer and method, but the evidence shows there was no known mixer and method except Finley's that would meet the requirements of the specifications.

Plaintiff contends that the designation of the exclusive use of the sealed rotary mixer prevented competitive bidding and for that reason the proceedings looking to the improvement are void.

The general rule is that where, as here, the charter of the city provides that public work shall be let to the lowest and best bidder, there must be an opportunity for competitive bidding. This rule applies in all cases where the material to be used is an article of common manufacture and may be had from different sources. The law would not permit a city to designate the use of vitrified paving brick manufactured by A when substantially the same kind and quality of vitrified paving brick manufactured by B, C, D and others might be had. Such a designation would itself create a monopoly and close the door to competitive bidding. But there is an exception to this general rule. The exception is that where the article desired is patented or held in monopoly, the governing authorities may nevertheless specify the use of such patented or monopolistic article if, in their judgment, it is of such exceptional superiority that it would be a public injury not to use it. [Custer v. Springfield, 167 Mo. App.

354, 360-1, 151 S. W. 759, and cases cited.] To hold otherwise would, in many instances, deprive cities of the benefit of the best material and most up to date machinery available, although superior in quality and lower in price than others of common manufacture and sale. [Swift v. St. Louis, 180 Mo. 80, 95, 79 S. W. 172; Asphalt Co. v. Hunt, 100 Mo. 22, 13 S. W. 98; Paving Co. v. Field, 188 Mo. 182, 200, 86 S. W. 860.]

There was substantial evidence tending to show that the use of the sealed rotary mixer with an appliance for the adding of the asphaltic cement under high pressure, produces a better pavement than any other known process, and at less cost. The chancellor so found. It should require no argument to demonstrate that it would be a public injury for those in authority to refuse to specify and use a machine and method that would produce better pavement at less cost than other machines and processes theretofore in use. There is, however, substantial evidence in the record tending to show that the designation of the use of the sealed rotary mixer would not prevent an opportunity for competitive bidding. It was shown that any reputable contractor could get one of these mixers without investing any money in it. The only requirement being that the contractor pay a royalty of twenty-five cents for each ton of material mixed, and at any time he ceased using the mixer he could return it to the company. There were in fact four bids for the work in question. But if it be conceded that some contractors might not be able to obtain one of the designated mixers, the fact that such mixer produces better pavement at less cost than other known processes, brings the case within the exception to the general rule requiring opportunity for competitive bidding and authorized the Board of Public Service to designate the use of such a mixer although it was covered by the Finley patent.

In support of the contention that the designation of the use of the sealed rotary mixer was unlawful and void because it prevented competition, the following cases are cited. [Curtice v. Schmidt, 202 Mo. 703, 101 S. W. 61; Swift v. St. Louis, 180 Mo. 80, 95, 72 S. W. 172; Schoenberg v. Field, 95 Mo. App. 241, 68 S. W. 945; Paving Co. v. McLord, 145 Mo. App. 141, 130 S. W. 371; Taylor v. Schroeder, 130 Mo. App. 483, 110 S. W. 26.] These cases do not support the contention made. On the contrary they are in line with what we have heretofore said.

For the reasons stated, the decree of the chancellor should be affirmed. It is so ordered. All concur.