Leonard WRING, Vernon Ward, James Padgett, Arthur Hardy, Henry Rudin and James A. Davis, Respondents,

v.

CITY OF JEFFERSON, Missouri, John G. Christy, Mayor of the City of Jefferson, Missouri, Interco Incorporated, Stern Brothers & Co. and Glore Forgan, Wm. R. Staats, Inc., Appellants.

No. 52445.

Supreme Court of Missouri,
En Banc.

March 13, 1967.

Rehearing Denied April 10, 1967.

Finch, Eager and Donnelly, JJ., dissented.

Harold Gruenberg, J. F. Souders, St. Louis, for respondents, Gruenberg, Schobel & Souders, St. Louis, of counsel.

Thomas P. Rose, City Atty., Jefferson, for appellants City of Jefferson, and John G. Christy, Mayor.

Robert B. Fizzell, Jr., Jerry T. Powell, Richard E. Petrie, Stinson, Mag, Thomson, McEvers & Fizzell, Kansas City, Henry P. Andrae, Alex G. Bartlett, Hendren & Andrae, Jefferson City, William H. Armstrong, Armstrong, Teasdale, Kramer & Vaughan, St. Louis, for appellants Interco Inc., Stern Bros. & Co. and Glore Forgan, Wm. R. Staats, Inc.

Norman H. Anderson, Atty. Gen., C. B. Burns, Jr., Asst. Atty. Gen., Jefferson City, amicus curiae.

Amos Wight, City Counselor, City of Nevada, amicus curiae.

STORCKMAN, Chief Justice.

This is a suit for an injunction to restrain the City of Jefferson from carrying out a project of industrial development undertaken pursuant to § 27, Art. 6, of the Constitution of Missouri, 1945, as amended November 8, 1960, V.A.M.S., and August 17, 1965, and §§ 71.790 to 71.850, RSMo 1965 Cum.Supp., V.A.M.S. The trial court issued the injunction and the City and other defendants have appealed. The questions presented on appeal are whether the City is lawfully authorized to sell the proposed industrial plant to Interco Incorporated, whether the City is required to let the contract for the construction of the industrial plant, and whether the proposed lease of the plant grants Interco immunity from taxation.

The facts of the case are not in dispute. The evidence on the more essential features is documentary and other evidence relates largely to the identity and status of the plaintiffs. At a special election held June 14, 1966, in the City of Jefferson, better known as Jefferson City, the following proposal was approved by a vote of 2732 to 86:

"Proposition to issue the industrial revenue bonds of the City of Jefferson, Missouri, to the amount of $8,500,000 for the purpose of purchasing and constructing an industrial plant to be leased to Interco Incorporated, a Delaware corporation, for manufacturing and industrial development purposes, including real estate, buildings, fixtures and machinery, said bonds to be payable solely from the revenues derived from a project for industrial development and not to be a general obligation of said City."

The City Council had adopted a resolution approving the project on May 16, 1966.

An application was made to the Division of Commerce and Industrial Development of the State of Missouri in accordance with the requirements of §§ 71.803, 71.807 and 71.810, RSMo, Cum.Supp.1961, V.A.M.S. The Industrial Development Commission of the Division approved the plan of industrial development, first on May 20, 1966, as the result of a telephone and mail ballot, and thereafter by formal approval given at a meeting held in St. Louis on July 12, 1966.

The City and Interco propose to enter into an agreement providing in essence that the proceeds of the $8,500,000 revenue bonds will be used to pay the cost of constructing an industrial plant in Jefferson City which will be known as the International Shoe Company Distribution Center and which will be responsible for the distribution of shoes throughout the United States. The City will lease the industrial plant to Interco, Inc., at rentals sufficient to retire the bonds as they become due and to pay the interest thereon. The bonds will be payable only from rentals due under the lease and the City has no obligation or authority to levy taxes to pay principal or interest on the bonds. The City has entered into a contract to sell the bonds to the defendants, Stern Brothers & Co. and Glore Forgan, Wm. R. Staats, Inc., investment bankers of Kansas City and Chicago, respectively. The basic term of the lease is twenty-five years and six months. The lease grants Interco an option to purchase the industrial plant upon payment of the principal and interest due on all outstanding bonds and the sum of one dollar to the City. Other pertinent provisions of the lease will be discussed in connection with the questions presented. When the plant in Jefferson City becomes operative, which is estimated to be sometime in 1968, Interco proposes to close its warehouse in the City of St. Louis. Interco, in accordance with its agreement, paid all the costs and expenses of the election held in Jefferson City, at which the issue of revenue bonds was approved.

On July 8, 1966, the plaintiffs filed in the Circuit Court of Cole County their petition to enjoin the consummation of the project described. The plaintiff James A. Davis is a resident, a registered voter and a taxpayer of the City of Jefferson. The defendant City owns the land upon which the warehouse is to be constructed. The right of the City to dispose of the industrial plant including the land, the building to be constructed thereon and the machinery and equipment to be purchased is in controversy. In these circumstances the plaintiff Davis is qualified to maintain the action. Hight v. City of Harrisonville, 328 Mo. 549, 41 S.W.2d 155, 158 [1]; 64 C.J.S. Municipal Corporations § 2152.

On August 15, 1966, the trial court entered its judgment and decree dismissing the petition with respect to the members of the Industrial Development Commission of the Division of Commerce and Industrial Development. The judgment and decree restrained and enjoined the defendants City of Jefferson, Mayor Christy, and Interco, Incorporated, from entering into or giving effect to the proposed lease between the City and Interco, and restrained and enjoined the City, Mayor Christy, Stern Brothers & Co., and Glore Forgan, Wm. R. Staats, Inc., from issuing, or purchasing or arranging for the sale of the $8,500,000 issue of industrial bonds.

The attorney general of Missouri represented the members of the Industrial Development Commission until they were dismissed from the case by the trial court. After the appeal was taken the attorney general applied to this court and was granted leave to file a brief as amicus curiae which we have before us in addition to the briefs of the parties.

The first issue presented is whether the City is authorized to sell the proposed industrial plant to Interco in accordance with the option granted by the lease, particularly Article XVII. The constitutional authority on which this project is based is § 27 of Art. 6 of the Missouri Constitution, which

at the relevant time was constituted as follows:

"Section 27. Any city or incorporated town or village in this state, by vote of four-sevenths of the qualified electors thereof voting thereon, may issue and sell its negotiable interest bearing revenue bonds for the purpose of paying all or part of the cost of purchasing, constructing, extending or improving any of the following: (1) revenue producing water, gas or electric light works, heating or power plants; [(2) plants to be leased *or otherwise disposed of pursuant to law* to private persons or corporations for manufacturing and industrial development purposes, including the real estate, buildings, fixtures and machinery;] or (3) airports; to be owned exclusively by the municipality, the cost of operation and maintenance and the principal and interest of the bonds to be payable solely from the revenues derived by the municipality from the operation of the utility [or the lease of the plant.]" Brackets and italics added.

Section 27 of Art. 6 relating to revenue bonds was new in the 1945 Constitution and except for changes in form and punctuation, its original content was the same as that part of § 27 set out above which is not enclosed by brackets; in other words, it related to traditional municipal functions such as water, gas and electric light works. At the general election on November 8, 1960, a constitutional amendment, Proposition No. 4, relating to industrial development plants, was adopted; this added a new section, No. 23(a), to Art. 6, and made certain amendments to § 27.

The new section, 23(a), relates to general obligations of a city, incorporated town or village having less than 400,000 inhabitants and so far as pertinent to the present inquiry provided that such municipality "may become indebted for and may purchase, construct, extend or improve plants to be leased or otherwise disposed of pursuant to law to private persons or corpora-

tions for manufacturing and industrial development purposes, including the real estate, buildings, fixtures and machinery". At the same time, § 27 of Art. 6 was amended by including industrial plants as a new subject for which revenue bonds could be issued. This amendment to § 27 consisted of the part included in brackets except the words that are italicized. See Laws 1959, pp. 10a–11a, House Joint Resolution No. 11, §§ 1 and 2. By another constitutional amendment adopted August 17, 1965, the words italicized consisting of "or otherwise disposed of pursuant to law" were added to § 27 as heretofore set out and designated. RSMo1965, Cum.Supp., § 27, p. 28; Laws 1965, House Joint Resolution No. 11. Thus, the Missouri Constitution conferred on municipalities the power and authority to purchase, construct, extend or improve plants for manufacturing and industrial development purposes. By virtue of § 23(a), these projects could be financed by the issuance of general obligation bonds; under § 27 revenue bonds could be issued. Both 23(a) and 27 at the time the instant project was initiated provided in identical language that such plants could be "leased or otherwise disposed of pursuant to law".

Sections 71.790 to 71.850, RSMo, V.A.M.S., relating to industrial development by municipalities, were enacted in 1961 to implement the grant of power conferred on municipalities by §§ 23(a) and 27 of Art. 6. RSMo, Cum.Supp. Both of these sections of the Constitution insofar as they relate to industrial development projects have been held not to be completely self-enforcing. State ex rel. City of Fulton v. Smith, 355 Mo. 27, 194 S.W.2d 302, 304 [3]; State ex rel. City of Charleston v. Holman, Mo., 355 S.W.2d 946, 949–950; Petition of Monroe City, Mo., 359 S.W.2d 706, 710–711. The plaintiffs contend that statutory authority is necessary to validate the sale of an industrial plant financed by the proceeds of revenue bonds and that none exists. They point out that § 71.850 which states that any municipality "may sell or otherwise dispose of" industrial plants

refers specifically to those acquired with the proceeds from the sale of general obligation bonds.

In support of this contention, the plaintiffs point out that §§ 71.820 and 71.847 require that a lease of industrial property acquired with the proceeds from the sale of revenue bonds shall be consistent with the provisions of the entire series of statutes numbered 71.790 through 71.850. The latter section referring specifically to general obligation bonds requires the sale or other disposition to be "upon approval by the division of commerce and industrial development" and further sets out this general standard and requirement: "The terms and method of the sale or other disposal shall be established by the division so as to reasonably protect and promote the economic well-being and the industrial development of the municipality." It could as plausibly be argued that §§ 71.820 and 71.847 incorporate by reference industrial revenue bonds as well as general obligation bonds within the coverage of § 71.850, but the decision need not rest on that ground alone because there is independent constitutional and statutory authority for the sale by a municipality of a facility acquired with the proceeds of industrial revenue bonds.

 Section 77.010 provides that cities of the third class, such as Jefferson City, "may purchase, hold, lease, sell or otherwise dispose of any property, real or personal, it now owns or may hereafter acquire." This legislative authorization is germane absent some statutory or constitutional provision expressly prohibiting its application. The term "pursuant to law" is broad enough to include appropriate existing law as well as laws subsequently enacted. See State ex rel. City of Fulton v. Smith, 355 Mo. 27, 194 S.W.2d 302, 304–305[2–4], where utility revenue bonds approved in accordance with existing statutes were held to be properly issued under § 27 of Art. 6 although registration of such bonds with the state auditor could not be compelled. Section 71.790 through 71.850 do not purport to forbid the application of

§ 77.010, although they regulate the methods and procedures under which the power regarding the sale of industrial plants may be exercised. These statutes provide that the plan must be approved by the Division of Commerce and Industrial Development under the legislative standards established, and that the project be carried out in accordance with the plan approved unless changed with the consent of the Division.

The first eight in the series of statutes, §§ 71.790 through 71.813, are of general application and provide the conditions under which municipalities must proceed and the standards by which the Division of Commerce and Industrial Development shall approve a plan submitted by a municipality. Section 71.803 among other things provides that the plan shall include: "(4) A statement of the terms upon which the facilities to be provided by the project are to be leased *or otherwise disposed* of by the municipality". Italics added. This disposition other than by leasing must be held to apply to facilities financed by revenue bonds as well as by general obligation bonds. The Division is directed by § 71.807 to approve the plan containing this as well as other proper provisions if it finds that the project: "(1) Will further the economic development of, and employment in, the municipality and the state; (2) Will further the general welfare of the municipality and the state; and (3) Is economically feasible and will not become a burden to the taxpayers of the municipality." The plan submitted by Jefferson City and approved by the Division contained an option for purchase as a part of the lease to Interco.

Furthermore, the Constitution directly confers on the municipality the *power* to sell industrial plants financed by revenue bonds *subject to appropriate statutory provisions* safeguarding the exercise of the power. In State ex rel. City of El Dorado Springs v. Holman, Mo., 363 S.W.2d 552, 559[7], this court held that the term "plants to be leased or otherwise disposed of pursuant to law" as contained in § 23(a) of Art. 6 of the Constitution authorized a sale

of the industrial plant. The El Dorado Springs case was decided in 1962 and the plaintiffs attach importance to the fact that § 71.850 was not thereafter amended to include revenue bonds expressly. This could have been done, but it was quite unnecessary because § 27 of Art. 6 was amended on August 17, 1965, by adding after "leased" the words "or otherwise disposed of pursuant to law" thereby harmonizing that provision completely with § 23(a) of Art. 6, which the El Dorado Springs case holds "comprehends and sanctions a sale" of an industrial plant. 363 S.W.2d loc. cit. 559. The identical language in § 27 used in the same context as in § 23(a) must be given the same meaning. An amendment of § 71.850 to mention revenue bonds specifically would have added nothing to the efficacy of the power to sell granted by the Constitution.

We hold that the City was empowered by § 27 of Art. 6, as well as by statutes, to grant Interco the option to purchase under the plan approved by the Division of Commerce and Industrial Development.

A more troublesome question is whether the City is obliged by statutory law to become a party directly to the contract for the construction of the industrial plant and to let the contract to the lowest and best bidder. First it will be helpful to become acquainted with the extent and nature of the City's participation as provided by the lease agreement.

Article IV of the lease deals with the means by which the building will be erected and the machinery and equipment installed. In essence it provides that Interco shall construct the buildings and improvements on the land in accordance with the plans and specifications approved in writing by the City; that all contracts with contractors must likewise be approved by the City; that complete insurance coverage must be provided and a performance bond supplied; that Interco warrants that the buildings and improvements will result in a facility suitable for use by it; that changes in the plans

may not be made without prior written approval of the City; that the City will pay for the construction of the buildings and improvements solely from the Construction Fund; that the City authorizes the fiscal agent to pay for the construction solely out of the Construction Fund from time to time upon receipt by the fiscal agent of a certificate signed by Interco and the architect. The plaintiffs say that such provisions of the lease are in violation of §§ 71.840, 71.843 and 71.847.

Sections 71.840 and 71.847 contain language which the plaintiffs contend indicates a legislative intention that an industrial plant must be erected under construction contracts executed by the municipality. Section 71.840 provides generally that when the funds have been received "the municipality shall purchase, construct, extend or improve the facilities as provided by the plan." This section at least requires adherence to the approved plan. Section 71.847 provides that the municipality shall have the authority to lease "the facilities purchased, constructed or extended by the municipality" and that the terms of the lease "shall be consistent with the other provisions of sections 71.790 to 71.850." The plaintiffs assert that these two statutes as well as § 71.843, which will be treated later, "require that construction contracts for such purpose be entered into by *City* and such contracts may be let by the *City* only after notice of letting and only upon competitive bidding."

At this point it may be well to note that the completed facility will consist of about 40 acres of land, the building, and certain machinery and equipment. The term *purchase* would at least properly apply to the land and the machinery and equipment. The term *construction* would apply to the erection of the building. Hence, it was entirely proper to say as was stated in the proposal submitted to the voters that the revenue bonds were to be issued for the purpose of *purchasing and constructing* an industrial plant, and as was stated in similar terms in the City's application to the Di-

vision of Commerce and Industrial Development, the resolution of the City Council approving the project, and the proposed lease.

There is authority to support the defendants' contention that the essential nature of this transaction is a purchase of the building by the City on an installment basis as it is erected and payments made. See Green v. City of Mt. Pleasant, 256 Iowa 1184, 131 N.W.2d 5, 23, and Gregory v. City of Lewisport, Ky., 369 S.W.2d 133, 135. In holding that competitive bidding was not required, the Gregory case states, 369 S.W.2d loc. cit. 135, as follows: Perhaps it would not be acceptable for a city to contract, before commencement of construction, to buy a building upon its completion, if the only purpose of the plan were to escape statutory regulations governing construction of buildings by cities. But here the plan has a legitimate purpose—to insure that the building will conform to the requirements of the lessee for whose use the building is designed. We think the statutes in question are aimed primarily at construction of buildings for *public use,* so when, as in the case here, a building is being acquired for use of private industry the courts should not search for possible motives of evasion in the plan for acquisition of the building if the plan does not literally violate the statutes and if it has an apparent legitimate purpose."

There is also authority for the proposition that in the construction of an industrial facility financed by revenue bonds the municipality may act through an agent or representative as provided in the proposed lease agreement and that statutes such as §§ 71.840 and 71.847 do not compel a construction that the municipality itself must directly construct the building or execute the building contract as a party thereto. See Green v. City of Mt. Pleasant, 256 Iowa 1184, 131 N.W.2d 5, 23, where in a similar situation the court stated: "Under the arrangement the development corporation is acting as a representative and agent for the city in the construction of the building, and in connection with this construction the de-

velopment corporation is authorized to incur certain obligations and is entitled to receive reimbursements out of proceeds of the sale of revenue bonds. It is the court's opinion the arrangement with the development corporation is actually one for the construction of a building by the city through its representative." In the present case the Division of Commerce and Industrial Development has deetrmined that the safeguards and supervision retained by the City under the plan submitted and approved are sufficient to satisfy the public interest.

The plaintiffs discount the persuasive authority of the Green and Gregory cases by the assertion that neither Iowa nor Kentucky have legislation requiring municipal control of construction and competitive bidding on these industrial development projects. Even if this contention, so far as it goes, were sound, it does not take into consideration the force and effect of § 27 of Art. 6 which authorizes the proceeds of the bonds to be used to pay *the cost* of purchasing and constructing the facility as well as the provision that the bonds must be paid *solely* from the revenue derived from the facility.

■ Section 71.843, further relied on under the second section of plaintiffs' brief, provides that: "Whenever the approved plan for the project calls for the construction, improvement or extension of facilities, the municipality shall enter into a contract for the purpose. All contracts shall be let on competitive bidding to the lowest and best bidder. Notice of the letting of the contracts shall be given in the manner provided by section 8.250". Section 8.250 deals with contracts for "the expenditure of moneys appropriated by the state in whole or in part, or raised in whole or in part by taxation", but the reference is to the manner of giving notice. Legislative provisions requiring public works to be awarded upon a public letting to the lowest responsible bidder are intended to secure unrestricted competition among bidders, eliminate fraud and favoritism, and avoid undue and excessive

costs which would otherwise be imposed on taxpayers. Hillig v. City of St. Louis, 337 Mo. 291, 85 S.W.2d 91. But such a provision is not invariably applicable. Wegmann Realty Co. v. City of St. Louis, 329 Mo. 972, 47 S.W.2d 770, 775[5].

■ Ordinarily a statute requiring competitive bidding on public improvements is applicable only to contracts whereby the city itself assumes an obligation or indebtedness. 63 C.J.S. Municipal Corporations § 1148, p. 814, n. 36.5 1966 pocket part. 63 C.J.S. Municipal Corporations § 1148, p. 814, states: "A statute requiring a call for bids in the case of improvements to be paid out of general funds of the municipality has been held inapplicable to improvements payable out of the revenues from the improvement or out of special funds provided therefor." Supporting this statement are two cases dealing with funds from revenue bonds and applying what is sometimes referred to as the "special fund doctrine". See Utah Power & Light Co. v. Provo City, 94 Utah 203, 74 P.2d 1191, cert. den. 305 U.S. 628, 59 S.Ct. 92, 83 L.Ed. 402, and Barnes v. Lehi City, 74 Utah 321, 279 P. 878. This doctrine is recognized and applied in Missouri. In Kansas City Transfer Co. v. Huling, 22 Mo.App. 654, it was held that a provision of the charter of Kansas City which required all city improvements to be let by contract to the lowest and best bidder was not violated since the provisions did not apply to work done at the expense of adjacent property holders.

The proposition approved by the voters of Jefferson City places a limit of $8,500,000 upon the amount of bonds that can be issued. The construction fund is therefore limited to the proceeds of the revenue bonds. The lease agreement provides that if less than the total sum is needed to acquire the facility the remainder shall be used to retire bonds. If the facility costs more than $8,500,000, Interco agrees to pay the difference. All the constitutional and statutory provisions meticulously guard against the municipalities incurring any personal liability or obligation with respect to projects financed by revenue bonds. Section 27 of Art. 6 provides that the principal and interest of the bonds shall be payable "solely from the revenues derived by the municipality" which in this case are rental and other payments provided by the lease of the facility. All of the statutes likewise undertake to prevent the municipality from incurring a general obligation. It would be entirely out of harmony with the character and all attributes of revenue bonds if the intention of § 71.843 was to require a municipality in sponsoring the erection of a specialized industrial plant to become a party to the contract for all purposes and to let the contract on competitive bidding to the lowest and best bidder. It would be contrary to the central purpose of permitting the issuance of this kind of bonds.

Such a requirement would expose the municipality to the risk of incurring a general obligation, of undertaking to make an illegal contract, or reading into the statute exceptions and qualifications that its language does not permit. These examples demonstrate the possibilities. If we construe § 71.843 as requiring the City in the case of a revenue bond project to enter into the usual construction contract without limitation as to the funds from which the agreed contract price will be paid, one of two things will happen. If the contract price is *less* than the debt limitation imposed by §§ 26(a) and 26(b) of Art. 6, there will be a valid contract which creates a debt or obligation *separate and apart* from the revenue bond obligation. The contract creditor in this instance would not be limited to the special fund derived from the proceeds of revenue bonds, but could resort to general revenue funds for the payment of this contract indebtedness. Sager v. City of Stanberry, 336 Mo. 213, 78 S.W.2d 431, 438–439[4]; Hagler v. City of Salem, 333 Mo. 330, 62 S.W.2d 751, 753[1]; Hight v. City of Harrisonville, 328 Mo. 549, 41 S.W.2d 155, 159 [3].

If the contract price *exceeds* the debt limitation imposed by §§ 26(a) and 26(b),

then the contract is ultra vires and void ab initio because a proposal to incur a *debt* of this magnitude must be submitted at an election and be approved by two-thirds of the qualified electors voting thereon. Grand River Township, De Kalb County v. Cooke Sales & Service, Inc., Mo., 267 S.W.2d 322, 325[3–5]; Shikles v. City of Clinton, Mo. App., 319 S.W.2d 9, 11. In this second instance, compliance with § 71.843 would be legally impossible although the City was lawfully authorized by § 27 of Art. 6 and a vote of the people to issue revenue bonds. The statute would thus thwart the purpose of issuing the revenue bonds.

On the other hand, if we construe § 71.-843 as authorizing or directing the City to enter into a contract limiting and confining the source of payment to the special fund realized from the sale of revenue bonds, we would be reading into the statute an exception or limitation not expressed or warranted by its broad language. Furthermore, the exception or qualification would not be necessary if the project is to be constructed with the proceeds of general obligation bonds which are "debts" within the meaning of § 26(b), Art. 6, of the Constitution, and no additional burden would be imposed by compliance with § 71.843.

The construction of §§ 71.840, 71.843 and 71.847 urged by the respondents would impair and restrict the constitutional right of the City under § 27 in that these sections would compel the City to "enter into a contract" and "to construct" the facility in derogation of the City's constitutional right to issue and sell revenue bonds "for the purpose of *paying* all or part of *the cost* of purchasing [or] constructing" the facilities specified. Emphasis added. This portion of § 27 has been held to be self-enforcing. See State ex rel. City of Fulton v. Smith, 355 Mo. 27, 194 S.W.2d 302, 304, wherein this court said: "On the contrary its very terms are that any city, upon a prescribed vote, '*may* issue and sell,' etc. We think the language so plain, and its intent so evident that it must be held to directly confer upon

the city the authority to issue and sell such revenue bonds as are here under scrutiny 'by vote of four-sevenths of the qualified electors thereof voting thereon.' "

In general a constitutional provision is subject to the same rules of construction as other laws with due regard being given to the broader scope and objects of the constitution. State ex rel. Curators of the University of Missouri v. Neill, Mo., 397 S.W.2d 666, 669[2]. The general rule is that where an act is amended the parts retained are regarded as a continuation of the former law and are entitled to receive the same construction. State ex rel. Klein v. Hughes, 351 Mo. 651, 173 S.W.2d 877, 880[4, 5]; State v. Ward, 328 Mo. 658, 40 S.W.2d 1074, 1078[11]. Unchanged by the amendments are those parts of § 27 which empower the cities to issue and sell revenue bonds to pay the cost of purchasing and constructing the several projects and to restrict the payment of the bonds and interest solely to the revenues derived from the operation or lease of the facility. In the later case of Petition of Monroe City, Mo., 359 S.W.2d 706, 710–711, there was no retreat from the holding in the City of Fulton case that § 27 as originally adopted was self-executing. The Monroe City case holds the part added or *wedged* into § 27 relating to the lease or other disposition of a plant for industrial development did need a "statutory charting of its course". There is no contention that the holding of City of Fulton has been impaired in any material respect.

Comparison of pertinent portions of § 23(a) and § 27 of Art. 6 further demonstrates the greater power and flexibility conferred directly on the municipalities by § 27. For instance, § 23(a) provides that the cities specified may become indebted for the purchase or construction of manufacturing and industrial plants to be leased or otherwise disposed of pursuant to law to private persons or corporations. The basic theory of revenue bonds as expressed in § 27 is to prevent the cities from becoming indebted for any of the projects authorized.

The latter part expressly provides that the revenue bonds and interest shall be payable *solely* from the revenues derived from the facility. Section 23(a) further provides that the indebtedness incurred thereunder shall not exceed ten percent of the value of taxable tangible property in the city. By contrast, § 27 imposes no limitation upon the amount of revenue bonds that may be issued. The language of § 27 and its constitutional context indicates an intention to avoid any general obligation or liability being imposed on the city in connection with the industrial plant proposed.

It should be further noted that this constitutional provision does not require the city itself to construct the building; the language of the constitution is that the funds derived from the sale of revenue bonds shall be used for the purpose of "paying all or part of the cost" of constructing the industrial plant. The language used imposes no such restriction. Legislation may be enacted to implement and facilitate the operation of a constitutional provision without impairing those parts which are self-executing, but all such legislation must be subordinate to the constitutional provision and in furtherance of its purposes and must not tend to narrow or embarrass it. State ex rel. Randolph County v. Walden, 357 Mo. 167, 206 S.W.2d 979, 986[14]; State ex rel. City of Fulton v. Smith, 355 Mo. 27, 194 S.W.2d 302, 305[5].

■ Our decision is limited to the factual situation before us. We do not decide that § 71.843 is wholly unconstitutional or that it could not apply to some project handled and financed in another manner. We do hold under controlling constitutional provisions and existing law that §§ 71.840, 71.843, and 71.847 have no legal standing to require a municipality itself to construct or to enter into the construction contracts for a project financed as in this case by industrial revenue bonds and to let such contracts by competitive bidding to the lowest and best bidder. The contention that the lease agreement fails to comply with §§ 71.840, 71.843,

and 71.847 and is invalid for that reason is denied.

■ The plaintiffs' final contention is that the proposed lease "grants Interco immunity from taxation, is discriminatory against property owners and taxpayers of the City of Jefferson and constitutes an unlawful delegation of legislative authority to Interco." Article V of the lease deals with what appears to be every conceivable tax or assessment that may be imposed upon or assessed against or payable for or in respect of the Facility; they are collectively referred to as "Impositions". The part of which the plaintiffs specifically complain is the last sentence of the first paragraph of Article V which reads as follows: "Landlord covenants that without Tenant's written consent it will not unless required by law take any action which may reasonably be construed as tending to cause or induce the levying of assessment of any Imposition (other than special assessments levied on account of special benefits) which Tenant would be required to pay under this Article and that should any such levy or assessment be threatened or occur Landlord shall, at Tenant's request, fully cooperate with Tenant in all reasonable ways to prevent any such levy or assessment."

The provisions of Article V do not grant, or purport to grant, Interco immunity from taxation; they are not discriminatory and do not constitute an unlawful delegation of legislative authority. At most the part complained of is an agreement to cooperate in resisting unlawful assessments. The first part of the first paragraph specifically binds Interco to assume and pay all Impositions against the property subsequent to the time the City acquires the land on which the facility will be constructed. The second paragraph of the article requires Interco to furnish the City with a photostatic copy of a receipted statement showing payment of any Imposition which Interco is obligated to pay within thirty days after the last day for payment. By the second paragraph of the article, the

City agrees not to sell the fee or any interest in the facility during the term of the lease or any renewal thereof. The final paragraph grants Interco the right to contest the validity or the amount of any Imposition which Interco is obligated to pay upon posting a suitable surety bond. The entire article recognizes the obligation of Interco to pay all lawful Impositions and cannot be construed as any agreement for immunity, discrimination or lack of uniformity with regard to taxation. The contention is denied.

We have examined all of plaintiffs' contentions and find them to be without merit. The trial court erred in finding the issues in favor of the plaintiffs and against the defendants, City of Jefferson, John G. Christy, Mayor, Interco Incorporated, Stern Brothers & Co., and Glore Forgan-Wm. R. Staats, Inc., and erred in restraining and enjoining said defendants from entering into or giving effect to the lease by and between City of Jefferson, Missouri, and Interco Incorporated, which was submitted in support of the application by the City of Jefferson to the Division of Commerce and Industrial Development on May 17, 1966, for issuance of industrial revenue bonds in the amount of $8,500,000.

Accordingly the judgment of the trial court is reversed.

This court further finds the issues in favor of the said defendants and against the plaintiffs and orders, adjudges and decrees that said lease as proposed is not invalid and that plaintiffs' petition be dismissed at plaintiffs' cost.

HOLMAN, HENLEY and SEILER, JJ., concur.

FINCH, J., dissents in separate dissenting opinion filed; EAGER and DONNELLY, JJ., dissent and concur in separate dissenting opinion of FINCH, J.

FINCH, Judge (dissenting).

I respectfully dissent from the majority opinion herein. I would hold that § 71.843, RSMo 1965 Cum.Supp., V.A.M.S. (requiring Jefferson City to be a party to the construction contract and to let the contract on competitive bidding to the lowest and best bidder) is applicable, that said statutory requirement was not complied with, and that for such reason the action of the trial court should be affirmed.

The principal opinion assigns several reasons for holding that the City was not required to be a party to the construction contract or to let the same on competitive bidding as required by § 71.843. I do not agree with any of the reasons assigned, and because, in my judgment, some of the principles announced in the majority opinion are unsound and may have considerable impact, I discuss them herein at some length.

The first basis advanced in the principal opinion for upholding the lease agreement between the City and Interco is that this transaction did not involve construction by the City at all but rather was simply an installment purchase by the City of the facility "as it is erected and payments made." This portion of the opinion is couched in language that "there is authority to support the defendants' contention" that this was a purchase by the City of the building on an installment basis. I interpret this as a holding that this was an installment purchase, not a mere discussion of what it might have been. If it were the latter, of course, it would not provide any basis for the result reached.

Is this an installment purchase of a building by the City? I think not. A purchase by the City involves a sale by someone and requires that there be a seller as well as a buyer. Supposedly, this holding would treat the City as an installment purchaser, but nothing is said as to who would be the seller or what such seller would have to sell. It is recognized in the majority opinion that title to the real estate is to be in

the City. Absent some specific reservation, improvements on real estate in the way of buildings or fixtures vest immediately in the owner of the real property. This is true under well-established principles of law, and the lease agreement between Interco and the City specifically so provided. A paragraph entitled "Facility Property of Landlord" provided that work, materials, improvements, machinery and equipment would become the absolute property of the City immediately when erected or installed. There was no provision of any kind providing that title would be retained until payment was made by the City. I am unable to find a single word anywhere in either the plan submitted to the Division of Commerce and Industrial Development (sometimes referred to as Division) or in the lease between Interco and the City which even intimates that this was an installment purchase of a building by the City. All references are to construction, not purchase. If this is in fact an installment purchase, it seems clear that things were not as they seemed and that the parties at the time did not so recognize or realize. It seems to me that to hold under the facts here that this was an installment purchase by the City as it made payments on the Architect's Certificate represents a radical change in the law of real property in this state.

The second ground relied on in the majority opinion is that "there is also authority for the proposition that in the construction of an industrial facility financed by revenue bonds the municipality may act through an agent or representative as provided in the proposed lease agreement and that statutes such as §§ 71.840 and 71.847 do not compel a construction that the municipality itself must directly construct the building or execute the building contract as a party thereto." Again, this discussion is phrased in "there is authority to support" language, but I treat it as being intended to be a definite holding on which the majority opinion relies for the result reached. Any other treatment would classify it as mere academic discussion of what might have been.

Cases cited in support of this second proposition are Green v. City of Mt. Pleasant, 256 Iowa 1184, 131 N.W.2d 5, 23, and Gregory v. City of Lewisport, Ky., 369 S. W.2d 133, 135. It should be observed that in neither Iowa nor Kentucky was there any statute comparable to § 71.843. Neither state had legislation requiring that the municipality itself be a party to the contract on industrial development projects or that such contracts be awarded on competitive bidding. These cases cannot be authority for this court to ignore the explicit directions of § 71.843 that the City itself enter into the contract.[1]

The majority opinion cites no Missouri decision or statutory authority which recognizes or grants to a city of the third class the right to act through an agent or representative (instead of itself being a party to the contract) to build and equip an industrial plant with municipal funds. Such cities are established by authority of the state. They do not possess residuary or reserve powers. Rather, they have the authority conferred on them by statute or constitutional provision. Section 71.843 explicitly covered contracts by municipalities for construction of industrial plants. This was specifically recognized by this court in the case of Petition of Monroe City, Mo., 359 S.W.2d 706, 709, as follows: "Whenever the approved plan calls for the con-

---

1. The opinion also cites 63 C.J.S. Municipal Corporations § 1148, p. 814, as supporting a statement that "ordinarily a statute requiring competitive bidding on public improvements is applicable only to contracts whereby the city itself assumes an obligation or indebtedness." The text of C.J.S. does not say that ordinarily this is the rule. Rather, it states that it has been so held, citing two Utah cases. The note 36.5 in the pocket part, referred to in the opinion, does not support the position taken. In any event, these citations do not provide a basis, in my judgment, for circumventing the clear and precise directions of § 71.843.

struction, improvement or extension of facilities, the municipality is required to enter into a contract for that purpose, the same to be let on competitive bidding, after notice of the letting, etc. § 71.843." The procedure followed by the City did not comply with § 71.843 or with what this court said was necessary in the Monroe City case. It appears to me that the majority opinion is overruling what this court said in Monroe City without saying so.

In its discussion of this second proposition, the majority opinion states that "in the present case the Division of Commerce and Industrial Development has determined that the safeguards and supervision retained by the City under the plan submitted and approved are sufficient to satisfy the public interest." Apparently, the opinion is accepting the contention advanced by defendants in their briefs that § 71.843 should be construed to apply only when the plan submitted to and approved by the Division provides that the construction contracts are to be let by the City. The theory of defendants is that under § 71.813 the City submitted a plan to the Division for approval and it called for construction by Interco. Now, say defendants, that approved plan is to be carried out by the City pursuant to § 71.840 when it has received funds for that purpose. The net effect of this contention is to place in the Division the right to determine whether compliance with § 71.843 by a city is required. Counsel so conceded in oral argument. I cannot agree that the language of the statute is subject to this interpretation. Section 71.843 *does not* say that compliance with it shall be necessary if, and only if, the approved plan so provides or the Division requires. Instead, it states specifically that whenever the approved plan calls for construction, "the municipality shall enter into a contract for the purpose" thereof. The section requires publication of notice of the letting of contracts and states that "all contracts shall be let on competitive bidding to the lowest and best bidder." How could the language be more definite

and specific? There is not the slightest intimation that the Division is vested with authority in approving a plan to require or waive compliance by the City with § 71.843.

As a matter of fact, I find no language in the plan submitted to the Division or in the attached lease between Interco and the City which would indicate to the Division that there would be no advertisement for bids or that contracts would not be let on the basis of competitive bidding. In the very first paragraph of the application by Jefferson City to the Division of Commerce and Industrial Development the City applies "for approval of the Project for industrial development herein described, to be carried out pursuant to Sections 71.790 to 71.850, 1965 Supplement to Revised Statutes of Missouri, 1959." Those section numbers include § 71.843 and at least by inference the language of the application would indicate an intention to comply with § 71.843. Certainly, there was nothing to indicate an intention not to comply. It is true that the lease itself, which was attached to the application, contained a provision that Interco would construct the building and improvements, entering into contracts with contractors which would be approved in writing by the City. Nowhere, however, was there any statement or intimation that these would be privately negotiated contracts, not advertised, and not let on competitive bidding. I find no basis for concluding that the Division of Commerce approved an arrangement whereby contracts were to be privately negotiated. There was no such explanation in the plan submitted to the Division nor is there anything in the letter of approval by the Division which so provided.

Even if such provision had been included in the plan and had been approved by the Division, I am of the opinion that such action would not have been authorized under §§ 71.790 through 71.850, inclusive. Those statutes did not give the Division authority to excuse compliance with § 71.843 by the City.

The main reliance of the principal opinion seems to be on the thesis that § 71.843, at least as it applies to industrial plants financed with revenue bonds, is unconstitutional. This whole issue of constitutionality is raised sua sponte in the majority opinion. None of the briefs filed on behalf of defendants assert or urge that § 71.843 is unconstitutional. Interwoven in this argument are contentions that (1) § 71.843 is completely out of harmony with the character and attributes of revenue bonds, (2) the City, by being a party to the construction contract, risks a general obligation and is in danger of violating the debt limitations imposed by §§ 26(a) and 26(b) of Art. VI of the Missouri Constitution, and (3) the provisions of § 27 of Art. VI of the Constitution are self-executing and § 71.843 would narrow or embarrass those self-executing provisions and for that reason is unconstitutional.

I cannot agree that there is incompatibility in financing a project with revenue bonds and requiring the City itself to contract for construction on the basis of competitive bids, or that such procedure "would be contrary to the central purpose of permitting the issuance of this kind of bonds."

The difference in revenue and general obligation bonds is not in how contracts are awarded or who is the contracting party, but rather in the source of funds from which the bonds are retired. General obligation bonds are payable out of tax revenues and general funds. They are general obligations of the city or other issuing agency. Revenue bonds are payable solely and exclusively from revenue received from the project and are not debts or general obligations of the city or issuing agency. Section 71.820 specifically so provided with reference to the bonds here involved, and § 27 of Art. VI of the Missouri Constitution likewise so provides.

Section 71.840 provides that, "When funds have been received by the municipality for the carrying out of the project, the municipality shall purchase, construct, extend or improve the facilities as provided by the plan." The City, pursuant to that section, would sell bonds and have the money on hand in the construction account before awarding the construction contract. This would be true whether the bonds authorized and sold were revenue or general obligation bonds, or a combination of the two. Those are the funds which the Division would have approved and the voters authorized as the funds for use in constructing the facility. Consequently, it would make no difference in the advertisement for bids and the execution of contracts whether the funds had come from one type of bond or the other. There is, no inconsistency or incompatibility between the City itself awarding the construction contracts based on competitive bidding and the type of bond which produced the funds then on hand in the construction fund for use in paying for said construction.

Likewise, I cannot agree that the City would risk a general obligation or be in danger of violation of §§ 26(a) and 26(b) of Art. VI of the Missouri Constitution by directly contracting for the construction of industrial plants to be financed by revenue bonds. The principal opinion contends that this risk exists if the bond proceeds were from revenue bonds but not if they were from general obligation bonds. It is interesting to note, as previously mentioned, that this proposition is raised sua sponte in the principal opinion and is not urged by the defendants. In that connection, the brief of the defendants (appellants) filed in this court when this case was reargued, states as follows: "Appellants doubt if there is a distinction between construction contracts to be paid out of the proceeds of general obligation bonds and those to be paid out of the proceeds of revenue bonds. Section 26 of Article VI of the Constitution prohibits a city from incurring any indebtedness in excess of funds on hand and Appellants believe such limitation applies to all construction contracts. Such restriction does not apply if bond proceeds are available to pay the

contracts. If, however, the obligation incurred by the construction contract should exceed the bond proceeds the contract would be void, at least to the extent of the excess, and the City's general credit would not be affected regardless of the nature of the bonds." This position was reiterated in oral argument. Thus, even the defendants do not agree with this portion of the principal opinion.

The principal opinion, in presenting this matter of the possibility of the City incurring a general obligation and possibly violating §§ 26(a) and 26(b) of Art. VI of the Constitution, sets up a straw man which it then attacks. The opinion says: "If we construe § 71.843 as requiring the City in the case of a revenue bond project to enter into the usual construction contract without limitation as to the funds from which the agreed contract price will be paid, one of two things will happen." This statement starts on the false premise that the construction contract should or would so provide and that the statute so requires. This is not the case. I do not think that we may assume that the City would enter into a contract which would undertake to create a general obligation instead of an obligation to pay from the revenue bond proceeds. The plan submitted by the City to the Division called for construction from revenue bond proceeds. Section 71.803 requires that the application include a "statement of the source of funds to be expended for the project." Pursuant thereto, the City submitted an application which included the following:

"3. *Source of Funds to be Expended for the Project.* The source of funds to be expended for the project will be the proceeds of $8,500,000 principal amount of industrial revenue bonds to be issued pursuant to the statute aforesaid and Section 27 of Article VI of the Constitution of Missouri, 1945, as amended August 17, 1965. The bonds will mature over approximately a 25-year period."

The voters of the City approved construction from industrial revenue bonds in the amount of $8,500,000, as shown by the proposal quoted in the majority opinion. The plan and the proposed lease specifically provided that Interco would pay any costs above those taken care of by the proceeds of the $8,500,000 revenue bond issue and would hold the City harmless therefrom.

Where is there any basis for assuming that the construction contract entered into by the City would obligate the City beyond what the plan provided? Section 71.843 refers to a contract to carry out the approved plan. It is perfectly logical and consistent with § 71.843 that the City, in calling for construction bids, would provide in its proposed contract and specifications that the project would be financed and paid for by the proceeds of the $8,500,000 in revenue bonds, that estimates as approved by the architect would be paid by the fiscal agent out of that fund, and that any costs in excess of those taken care of by the amount in that fund would be paid by Interco, pursuant to the contract between it and the City. The contract would provide that the City would have no obligation beyond the construction fund derived from the sale of the bonds. Under these circumstances, there simply would be no occasion for the City to incur a general obligation or to risk violation of §§ 26(a) or 26(b) of Art. VI of the Constitution. I would see no obstacle to having Interco be an additional party to the construction contract, if desired, obligating it to do what the proposed lease did, namely, to agree to pay any costs over and above those taken care of by the revenue bond proceeds and holding the City harmless from such additional costs.

The same argument regarding exposure to additional liability, advanced in the principal opinion with respect to revenue bonds, could be advanced if general obligation bonds were being used, if it be assumed that the City, in contracting for the facility, would not limit its obligation to the receipts of the bonds approved by the voters and approved in a plan submitted to the Division.

Actually, the City, in that instance, undoubtedly also would limit its obligation to funds in the construction fund and would provide that any additional cost would be paid for by Interco, pursuant to the contract between Interco and the City.

The principal opinion relies on the case of Sager v. City of Stanberry, 336 Mo. 213, 78 S.W.2d 431, and earlier cases cited therein. Actually, that case supports the position taken in this dissent. I will not lengthen this opinion by reviewing the facts. Those interested may read the case where it is reported. The opinion does include the following pertinent statement, 1. c. 438: "The special fund doctrine is recognized in this state, i. e., that a city does not create an indebtedness within the contemplation of the constitutional proviso by obtaining or purchasing property which is to be paid for solely and exclusively from a special fund derived from the income of the property with no liability on the part of the city to pay such purchase price or any part thereof directly or indirectly with funds raised by taxation or from a fund which must be replenished by funds raised by taxation. State ex rel. City of Hannibal v. Smith (Mo.Sup.) 335 Mo. 825, 74 S.W.2d 367; Bell v. City of Fayette, 325 Mo. 75, 28 S.W.2d 356; Hight v. City of Harrisonville, supra; Hagler v. City of Salem, supra."

The "special fund doctrine" was not applied in that case because the city by its contract had obligated itself to supplement the special fund from general or other revenues and the purchase, therefore, was not to be made with income coming exclusively from the property.

In the case of Grossman v. Public Water Supply Dist. No. 1 of Clay County, 339 Mo. 344, 96 S.W.2d 701, 706, this court again said: "It has been held repeatedly in this state that the constitutional limitation imposed by section 12, article 10 of the Missouri Constitution on the indebtedness a

political corporation may incur, contemplates a debt which must be paid directly or indirectly by resort to taxation. State ex rel. Smith v. City of Neosho, 203 Mo. 40, 82, 101 S.W. 99, 109; Bell v. City of Fayette, 325 Mo. 75, 91, 28 S.W.2d 356, 361; Hight v. City of Harrisonville, 328 Mo. 549, 558, 41 S.W.2d 155, 158; Hagler v. City of Salem, 333 Mo. 330, 336, 62 S.W.2d 751, 754; State ex rel. City of Hannibal v. Smith, 335 Mo. 825, 833, 74 S.W.2d 367, 371; Sager v. City of Stanberry, 336 Mo. 213, 227, 78 S.W.2d 431, 438." [2]

The court then went on to say, 1. c. 706: "It is likewise well established that the 'special fund doctrine' prevails in Missouri, and that an indebtedness of a city or other like political corporation payable only out of income derived from the property purchased is not a debt within the meaning of the above provision of the Constitution. State ex rel. City of Excelsior Springs v. Smith, 336 Mo. 1104, 1112, 82 S.W.2d 37, 40; State ex rel. City of Hannibal v. Smith, supra, 335 Mo. 825, loc. cit. 834, 74 S.W.2d 367, loc. cit. 371."

In my judgment, requiring the City in this instance to be a party to the construction contract and to advertise and award contracts on a competitive basis to the lowest and best bidder does not violate §§ 26(a) and 26(b) of Art. VI of the Constitution. The "special fund doctrine" cases provide further support for that conclusion.

Finally, the principal opinion concludes that § 71.843 is unconstitutional as being in derogation of the City's constitutional rights under what the opinion states are self-executing provisions of § 27 of Art. VI of the Constitution. This conclusion is based on the proposition that § 27 conferred on the City the "right to issue and sell revenue bonds 'for the purpose of *paying* all or part of *the cost* of purchasing [or] constructing' the facilities specified." These rights, says the majority, were determined to be self-

2. Sec. 12, Art. 10 of the Constitution of 1875, referred to in the above quotation, was the predecessor of §§ 26(a) and 26(b) of Art. VI of the Missouri Constitution of 1945.

enforcing in State ex rel. City of Fulton v. Smith, 355 Mo. 27, 194 S.W.2d 302, 304.

It is true that in the Fulton case this court in 1946 held that the new § 27 of Art. VI of the 1945 Constitution was self-executing. At that time, however, the section covered only "revenue producing water, gas or electric light works, heating or power plants, or airports."

In 1960 the people amended § 27 of Art. VI by inserting a provision for revenue bonds for manufacturing and industrial plants. At the same election the people adopted § 23(a) of Art. VI, authorizing general obligation bonds for manufacturing and industrial plants. The general assembly, at the following session, enacted an enabling act, Laws 1961, p. 189, now known as §§ 71.790 to 71.850, applicable both to general obligation and revenue bonds for manufacturing and industrial plants. An emergency clause was included.

In the case of State of Missouri ex rel. City of Charleston v. Holman, Mo., 355 S.W.2d 946, this court was asked to mandamus the state auditor to register general obligation bonds issued by the City of Charleston to erect an industrial plant, pursuant to § 23(a). This court held that § 23(a) was not self-enforcing and that enabling legislation was necessary. It further held that the enabling act passed by the legislature in 1961 was not an emergency measure and hence the act was not yet effective when Charleston proceeded to authorize general obligation bonds. Accordingly, the bonds were held to be invalid.

Monroe City also acted at about the same time to issue industrial bonds, but it sought to issue both general obligation bonds under § 23(a) and revenue bonds under § 27. It, too, acted prior to the effective date of the enabling act unless it constituted an emergency measure. When the case of Petition of Monroe City, Mo., 359 S.W.2d 706, reached this court, the Charleston case already had been decided. Accordingly, Monroe City conceded that its general obligation

bonds were not properly authorized and that since the enabling act was not an emergency measure, it was not yet effective when the city authorized issuance of the bonds. It contended, however, that the revenue bonds were valid on the theory that § 27 was self-executing under the decision in the Fulton case. However, this court held that the new portion of § 27 relating to industrial projects was not self-executing and that the Monroe City revenue bonds were invalid because they antedated the effective date of the enabling act.

In the Monroe City opinion, l. c. 710, Judge Leedy recognized that in Fulton this court "held § 27, Article VI of the Constitution, *as originally adopted in 1945,* to be self-executing." (Emphasis by Judge Leedy.) He referred to the fact that the original § 27 applied only to municipally owned utilities and airports. He then proceeded, l. c. 711, to state: "So much for the situation and state of the applicable law as of the time of the decision in the City of Fulton case. Since then the constitutional and statutory changes hereinabove pointed out have been made by which a wholly new concept of municipal governmental function has been introduced into the body of our law. We are unhesitatingly of the opinion that the mere expanding of § 27 by the simple device of wedging (so to speak) words embodying such new concept into or between provisions previously interpreted as being self-executing does not compel that same interpretation as to the new matter so inserted. Nor are we willing to say that it should be so interpreted, this for the reason that *this innovation by way of municipal financing of industrial projects is so new and untried, its possibilities so sweeping, and its operation and potentialities so utterly uncertain (and great) as to imperatively require statutory charting of its course.* This was recognized by the Legislature in passing the enabling act, and at least tacitly by the City of Monroe City in taking all steps requisite to the validity of the bonds pursuant to the enabling act, and relying thereon in the trial court; nor was it ever

contended in the trial court that the provisions of § 27, as amended, were self-executing. *We are of the opinion that the new provisions of said section* (under Amendment No. 4) *are not self-executing, and require legislation to carry them into effect, quite as much as did § 23(a), as held in the Charleston case."* (Emphasis added.)

I am of the opinion that the majority opinion clearly overlooks what this court held in Monroe City when it now asserts that "unchanged by the amendments are those parts of § 27 which empower the cities to issue and sell revenue bonds to pay the cost of purchasing and constructing the several projects." That statement is true with respect to utilities and airports, but it is not true with respect to industrial projects. Monroe City expressly and clearly holds to the contrary. I find inescapable the conclusion that the majority opinion overrules Monroe City without saying so.

The majority opinion would hold that with reference to industrial projects, § 27 is self-executing insofar as it authorizes the City on a four-sevenths vote to issue and sell revenue bonds for the purpose of purchasing, constructing, extending or improving industrial plants. If that is true, one necessarily would ask what it is that is left which is not self-executing? If § 27, without enabling legislation, authorizes a city to issue and sell the bonds and then spend the money and obtain an industrial plant, it is permitted to do the entire operation, and there is nothing left on which the doctrine of the Monroe City case could operate. If § 27 does so authorize the City, then what about the constitutionality of the sections of the enabling act which require submission of the plan to the Division for approval? Such a position necessarily is in direct conflict with what this court held in Monroe City. Apparently, the majority opinion seeks to limit the ruling of Monroe City to the words actually inserted following the number 2 and before the number 3 in § 27, but that would be wholly meaningless and is not what the opinion in Monroe City said or meant. When § 27 was amended in 1960, what the people really added by that amendment was a provision that any city, town or village by a vote of four-sevenths could issue and sell its revenue bonds for the purpose of paying all or part of the cost of purchasing, constructing, extending or improving plants for manufacturing and industrial purposes, to be owned exclusively by the municipality, and that the cost of operation and maintenance and the principal and interest of the bonds were to be payable solely from revenues received from operation of the plant. This is what Monroe City held to be not self-executing. That being true, the legislature had the right to adopt the enabling act and very properly inserted § 71.843 in that act.

There is no inconsistency between the requirements of § 71.843 and the provisions of § 27 of Art. VI of the Constitution. I think it is fair to say that the State of Missouri has a rather well defined policy of requiring that contracts (whether for construction or purchase) by the state or its agencies or subdivisions are to be awarded by the contracting agency on the basis of competitive bids submitted in response to published notice. Section 71.843 simply applies that procedure in the case of construction of industrial plants. This court said in City of Hannibal v. Winchester, Mo., 391 S.W. 2d 279, 286: "On matters of state policy or interest * * * the legislature may act, so long as it does not interfere with the constitutional method of annexation or enact laws inconsistent with it." That same principle would authorize § 71.843. If, as the majority indicates, this procedure is not to be applicable, and the City should contract through some agent or representative instead of directly, without any requirement of notice or competitive bidding, it seems clear that the door is opened so as to make possible those things which the policy of open competitive bidding is designed to avoid.

The result I would reach does not mean that the City could not build an industrial plant for Interco financed by revenue bonds.

**310**

It means simply that the City in so doing must comply with § 71.843. This should present no obstacles. As a matter of fact, it is common knowledge that Jefferson City has approved revenue bonds under § 27 for another industrial plant and has announced that the City will advertise for competitive bids as provided in § 8.250 (thereby following § 71.843).

There is no occasion to consider the other questions raised by plaintiffs because I would affirm based on failure of the defendants to comply with § 71.843.

I cannot conclude this opinion without expressing apprehension about possible effects of the majority opinion. I have mentioned the fact that it leaves cities free to contract privately through agents without the necessity for advertisement or competitive bidding. I call attention to § 91.170, RSMo 1959, V.A.M.S., which authorizes first, second, third and fourth class cities to construct waterworks, issuing revenue bonds for that purpose when authorized by a four-sevenths vote. The statute provides that work is to be let by the city on competitive bids to the lowest and best bidder. If, as the majority holds, revenue bonds are incompatible with direct contracting by the city, and if the city risks violation by such procedure of constitutional limitations on debt, or at least risks general obligations when not authorized by the people, it would appear that this court would be compelled to hold § 91.170 unconstitutional and that the cities could not follow that procedure but would have to act through representatives. Our state colleges and universities, for years, have been building dormitories and cafeterias with the proceeds of revenue bonds. These contracts are let by the institutions themselves on competitive bidding. These institutions also are restricted by constitutional limitations on becoming indebted beyond uncommitted funds available during the current year except for revenue bonds authorized by the statute. If utilization of direct contracting by these institutions is incompatible with revenue bond attributes, and if by contracting directly the institutions incur or risk incurring general obligations over and beyond the obligation to pay with the proceeds of the revenue bond issues, then it would appear that the majority opinion casts doubt on the propriety of this procedure by these institutions. It is true that the majority opinion states it is limited to the precise factual situation here involved, but the opinion does announce several definite and far-reaching principles of the law which I have discussed and which I would assume the court would be expected to apply consistently in other factual situations as and when presented.