WILLIAM ELMER DODD v. INDEPENDENCE STOVE AND FURNACE COMPANY, a Corporation, Appellant.—51 S. W. (2d) 114.

Division Two, June 10, 1932.

*NOTE:    Opinion filed at October Term, 1931, April 8, 1932; motion for rehearing filed; motion overruled at April Term, June 10, 1932.

*Harris & Koontz* and *John F. Thice* for appellant.

*Burrus & Burrus* and *Mosman, Rogers & Buzard* for respondent.

COOLEY, C.—Suit for damages for personal injuries tried in the Circuit Court of Jackson County at Independence. Plaintiff recovered verdict and judgment for $10,000 and defendant appealed. Since the trial the plaintiff has died and the cause has been revived in the name of his administrator.

Plaintiff alleged and his evidence tended to prove that he contracted tuberculosis while in defendant's employ as a result of inhaling dust generated in defendant's manufacturing process in which plaintiff

was employed, and his cause of action is based upon defendant's alleged failure to furnish him an adequate respirator for his use while engaged in such work, as required by statute, Section 6819, Revised Statutes 1919, Section 13254, Revised Statutes 1929. The sufficiency of the petition is not questioned. Defendant first answered by a general denial. During the trial and after plaintiff had offered his evidence in chief the defendant by leave of court filed an amended answer in which, after a general denial, it pleaded that the plaintiff had assumed the risk and that he had been guilty of contributory negligence in that he had failed or refused to use ''a protective device answering to the requirements of the respirator required by the Statutes of the State of Missouri.''

The defendant operated a manufacturing plant at Independence, Missouri, where it manufactured, among other things, cast-iron parts for stoves and furnaces. The castings emerged from the molds in which they had been cast with rough surfaces and with sand and perhaps other substances adhering to them, to remove which and to smooth and polish the castings they were subjected to a process called ''sand blasting.'' In that process fine sand was projected with considerable force by compressed air through a hose against the surface to be cleaned, the sand in the air stream acting as the cutting and polishing agency. The sand blasting was done in a small room about eight feet square maintained for the purpose.

Plaintiff's evidence tended to show the following: He was between nineteen and twenty years of age when employed by defendant in October, 1925; he was then strong and healthy and had never had any lung trouble or any serious illness; his father and mother were healthy and the family history showed no evidence of tuberculosis; when employed by defendant he was put to work at sand blasting in the sand blast room; he had had no previous experience in such work nor in any factory work and knew nothing about work of the kind he was given to do; the sand blasting process generated a great deal of dust, so much that plaintiff had to get his face within a foot and a half or two feet of the casting upon which he was working in order to see it. The air in the room would become dust laden even when the fan designed to produce ventilation and air circulation was working and when it was out of order, as often happened, he frequently had to stop work and ''go out to get my breath;'' he was told nothing about the effect the work might have upon him and did not himself know that it was having any effect on his health until just before he ''quit work,'' November, 1926. It is inferable from the evidence that the dust generated by the sand blasting process was composed, largely at least, of finely powdered sand, mixed perhaps with other substances ground off the castings by the action of the air driven sand.

When put to work plaintiff was given a ''helmet'' or ''mask'' to

use and which he did use as a protection from the sand and dust. It was a hoodlike canvas headgear designed, as we understand the record, to be pulled down over the head and to come down to or over the wearer's shoulders, with a string to draw it about the neck and with a window-like opening about four inches long and two and a half inches wide in front of the wearer's eyes and a smaller one at the back, both openings being screened with finely meshed wire. According to plaintiff's evidence the helmet, even when in good condition, would not prevent the inhalation of dust by the wearer because not only would dust come through the screen but it would come through the canvas and also from beneath it. Moreover, it soon became worn and defective. "The canvas front part would get holes in it which permitted the sand to come through and strike me on the face." He used that helmet about eight months during the last half of which time it was in the worn condition just described, although three months before being furnished with a new one he had complained to defendant's foreman who told him defendant was going to put in a new sand blast right away and "to try to make out with it until the new sand blast was installed." At the end of about eight months a new and better constructed sand blast room was installed and plaintiff was furnished a new helmet like the first. In a short time it too became worn, with holes developing, and defendant put a leather covering over the part of the canvas which covered the wearer's face This second helmet, in all respects like the first except for said leather covering, was introduced in evidence as plaintiff's Exhibit 1. It will be referred to hereinafter and is referred to in the record as Ex. P-1. It proved substantially as inefficient a protection from inhalation of dust as had the first and for like reasons. While holes did not wear through the leather they developed "around the edges of the screen" and dust worked through and under the canvas as with the first.

Plaintiff left defendant's employment in November, 1926. Some two months before quitting he began to feel a sensation in his lungs which he described as heartburn, and other symptoms of illness. He consulted a physician who advised him to quit the work he was doing. This he did after having, some three weeks before quitting, complained in vain to defendant's foreman of the defective condition of the helmet. Plaintiff's evidence was that he was furnished no device or equipment other than the helmet above described to protect him from inhaling dust.

Defendant's evidence tended to show that it furnished plaintiff in addition to the helmet a respirator, a rubber device fitting over the mouth and nose and containing a moistened sponge. It offered in evidence as its Exhibit 1 the respirator so claimed to have been furnished, which will be referred to herein, as at the trial, as Ex. D-1. It is conceded that Ex. D-1 was an adequate respirator and if it was

furnished as defendant contends, plaintiff's recovery herein was unauthorized, since the only negligence submitted was defendant's alleged failure to furnish an adequate respirator.

Plaintiff's evidence tended to show that when he left defendant's employ he had contracted tuberculosis and that it resulted from the inhalation of the dust while so employed. At the time of the trial the disease had admittedly reached an advanced stage. Physicians testified that in their opinion it was then incurable and that he could not live more than five years. As above stated, he has since died.

The evidence was conflicting as to the cause of the disease. In his statement here defendant says: "The question of the cause was a matter of very great dispute between the witnesses for the appellant and the witnesses for the respondent."

I. Appellant contends in its brief that its demurrer to the evidence should have been sustained because the evidence showed that plaintiff's tuberculosis "could not have been caused by the inhalation of sand or sand dust" and because the evidence did not show that prior to his employment he had a tubercular condition which might have been "inflamed or increased" by inhalation of the dust. As to the latter it was not plaintiff's claim that a pre-existing tuberculosis had been aggravated by inhaling the dust. On the contrary, he claimed and proved that prior to his employment he had not had such disease. On the issue of whether or not the inhalation of sand dust to the extent shown by plaintiff's evidence could and did cause him to contract the disease the evidence was conflicting, as appellant itself admits in its statement. The court could not therefore sustain the demurrer on that ground.

II. Appellant charges error in plaintiff's main Instruction 1, in that it included matters of which there was no proof, matters not pleaded, and "failed to include matters covered by the defense" which should have been referred to in the instruction. As to the latter, appellant nowhere advises us what "matters covered by the defense" were omitted. We discover no material omission. If appellant refers to its affirmative defense of contributory negligence, that was submitted by another instruction. But since appellant did not see fit to call our attention to the alleged omission we are not required to speculate as to what it may be or to search the record for it. The other specifications under that point in appellant's "Points and Authorities" are equally vague but from its printed argument we learn that they are as follows:

The first refers to that part of the instruction telling the jury what facts must be found to authorize recovery, wherein the jury is required to find, among other facts, that plaintiff was employed by defendant and was "required by the defendant to work in said factory

and use said sand which so generated dust," etc. The complaint of this part of the instruction seems to be that it was not shown that defendant "required" plaintiff to work for it at all. Appellant says: "If he accepted the job this was the work which was offered him. There was nothing compelling about it." Of course defendant did not compel plaintiff to work for it—and the statute under which this action was brought was not passed for the protection of workmen doing penal or enforced labor. And of course, too, the word "required" was not used in that sense in the instruction. But "if he accepted the job this was the work which was offered him" and he was required to do it at the place and with the equipment furnished him by defendant. This criticism of the instruction is obviously without merit.

The objection that the instruction included matters not pleaded is based upon the contention that the instruction told the jury it was defendant's duty to furnish plaintiff "an adequate respirator in good condition," whereas in plaintiff's petition it was charged only that defendant had failed to furnish "an adequate respirator," there being no allegation that a respirator not in good condition had been furnished. The statute requires the employer in circumstances such as here shown to furnish and maintain in good condition "adequate and approved respirators." The instruction required the jury to find as a condition to plaintiff's recovery, among other facts, that defendant did not furnish plaintiff "an adequate respirator in good condition so as to reasonably prevent inhalation by him of such dust, if any." Appellant argues that there was no evidence that the respirator, if furnished, was not in good condition. That is true if appellant means the respirator which it claimed it furnished. But the instruction could not have been understood to refer to that one, Ex. D-1, because the court peremptorily told the jury in another instruction that if it found that defendant had furnished Ex. D-1 or a duplicate thereof, the verdict must be for defendant. The words "in good condition" could only have referred to Ex. P-1 which defendant insisted was an adequate respirator within the meaning of the statute and which, according to plaintiff's evidence, was the only device furnished and was not in good condition or adequate if it had been. The evidence concerning its condition went in without objection. The qualifying words "in good condition" were probably superfluous but under the circumstances their insertion cannot be deemed prejudicial error.

III. Defendant pleaded that the plaintiff accepted the employment "with full knowledge of the conditions under which he was to be employed and with full knowledge of the dangers incident thereto" and thereby assumed "all the risks incident thereto." It requested and the court refused an instruction to the effect that if when

plaintiff accepted employment "the place at which he was to work and the kind of work he was to do and did thereafter do was demonstrated to him and that he knew of all the conditions surrounding such employment and the dangers, if any, incident thereto," the verdict must be for the defendant. In its brief appellant complains of the refusal of that instruction, which it there says "defined assumption of risk not included in appellant's answer" (sic.).

There was no evidence to justify submitting to the jury the proposition that plaintiff knew the danger of contracting tuberculosis or other disease from inhaling dust in the course of his work. Defendant strenuously denied throughout the trial, and does yet, that such result could follow inhalation of dust. An inexperienced boy could scarcely be assumed to know it. ■ But, more to the point perhaps, a servant does not assume a risk arising from the master's negligence. Violation of a statute or ordinance enacted for protection of the lives and health of employees engaged in occupations in which, without the safeguards required by statute, they are liable to injury, is negligence, and if defendant violated the statute the plaintiff did not assume the risk incident to such negligence. [Hall v. Brown (Mo. App.), 259 S. W. 871; Mabe v. Gille Mfg. Co., 219 Mo. App. 234, 271 S. W. 1023; State ex rel. Adair County Coal Co. v. Arnold (Mo.), 254 S. W. 850, 853; Butz v. Murch Bros. Constr. Co., 199 Mo. 279, 286, 97 S. W. 895; Grott v. Johnson, etc., Shoe Co. (Mo.), 2 S. W. (2d) 785, 790.] The requested instruction ignored the employer's negligence or assumed its non-existence. It was properly refused.

■ IV. Error is charged in the refusal of defendant's requested instructions f and j. The refusal of Instruction f is not preserved in the motion for new trial, hence is not here for review. Instruction j was to the effect that if defendant had "in its place of business" for plaintiff's use both Ex. P-1 and Ex. D-1 and plaintiff so knew and "failed or refused to use either of said devices," he could not recover. That instruction appears to us somewhat confusing. If it meant to declare that both devices were adequate respirators so that the furnishing of either would have been a compliance with the statute it was clearly incorrect because according to plaintiff's evidence Ex. P-1 was not an adequate respirator. If it meant only that if both devices were furnished plaintiff's failure to use *either* precluded recovery because Ex. D-1 was an adequate respirator, defendant got the full benefit of that hypothesis by a separate instruction telling the jury that if Ex. D-1 or a duplicate thereof was furnished for plaintiff's use he could not recover. So construed, Instruction j would have been mere repetition. There was no error in refusing it.

■ V. Defendant requested and the court refused an instruction lettered K, in substance that the words "noxious dust" as used in the statute meant "only such dusts as are inherently harmful by rea-

son of the component elements therein and does not mean dust which may be harmful by reason of the amount thereof or the manner of the handling of same," and that if the jury found that the dust complained of "was not so harmful in itself but only, if at all, by reason of the manner of the handling of the same, in such employment," plaintiff could not recover. In plaintiff's Instruction 1 the court had defined noxious dust as dust "hurtful or harmful, to employees using same," and further required the jury to find that it was harmful to plaintiff. The applicable part of the statute reads: ". . . in all processes of manufacture or labor referred to in this section which are productive of noxious *or* poisonous dusts adequate respirators shall be furnished and maintained by the employer in good condition and without cost to the employees, and such employees shall use such respirators at all times while engaged in any work productive of noxious *or* poisonous dusts." (Italics ours.)

Appellant argues that the word "noxious" as used in the statute means "deleterious or harmful in itself," regardless of the quantity that may be inhaled or the constancy and continuity of inhalation; in effect, that it means substantially the same thing as the word "poisonous" there used. Appellant, however, correctly says that the word "noxious" was "intended to mean something or it would not have been used in the statute;" and further in substance, that there are dusts generated in manufacturing processes which are not in their nature inherently harmful, that is, of a poisonous nature, deleterious to health, but which "if constantly and continuously breathed are for that reason harmful."

The construction of the statute contended for by appellant would make "or" mean substantially "that is," in other words "noxious, that is to say, poisonous" dusts, thus making the descriptive adjectives "noxious" and "poisonous" in effect synonymous. While the word "or" may sometimes be so used its ordinary use is as a disjunctive "that marks an alternative generally corresponding to 'either,' as 'either this or that.'" [46 C. J. 1124, sec. 1.] [See, also, State v. Combs (Mo.), 273 S. W. 1037, 1039; Case Threshing Machine Co. v. Watson, 122 Tenn. 148, 122 S. W. 86.] Appellant's construction would render one of said descriptive adjectives practically superfluous and the Legislature will not be presumed to have intended using superfluous or meaningless words in a statute.

Moreover, in construing a statute the evil sought to be remedied and the benefit intended to be conferred thereby should be considered. It is plain from the whole scope and tenor of the statutory provisions of which the section in question forms a part that the legislative purpose was to provide regulations for safeguarding the lives and health of laborers in occupations in which, without such safety regulations, they would be liable to injury or disease. Such statutes

should be construed so far as their language permits with the view of effectuating their beneficent purpose. It is conceded that dust may be generated in manufacturing processes which, though not inherently poisonous because of its chemical composition, may be injurious to the health of employees if they are compelled to inhale it constantly. Why attribute to the Legislature an intent to exclude such employees from the benefit of these safety regulations when the language it used in the legislative act, understood in its ordinary sense, not only does not compel but rather forbids such narrow construction?

Appellant cites Sections 6798 and 6826, Revised Statutes 1919, Sections 13234 and 13261, Revised Statutes 1929, as covering the field of protection from dust not inherently poisonous. Section 13234 requires employers using *machines* which generate "dust, smoke or poisonous gases" to provide for such machines hoods connected with suction fans, etc., to carry off such dust, etc., and prevent its inhalation by employees. Section 13261 provides regulations for protecting employees from dust in manufacturing operations therein referred to, but it is at least doubtful that it would apply to the process here involved. Nor does Section 13234, if literally construed, apply. If they did apply, the requirements of Section 13254 might nevertheless be sustained as further and additional safeguards of the health of employees. We see nothing in Section 13254 repugnant to either of the other above-mentioned sections. It may be observed also, as showing the legislative purpose, that Section 13234, supra, recognizes that dust, though it be not of inherently poisonous nature, may be deleterious to health if inhaled continually and seeks to protect employees from the danger of such inhalation in the situations therein specified. We do not agree with appellant's contention as to the construction of the statute and hold that Instruction K was properly refused.

"Noxious" is defined in Webster's New International Dictionary as meaning "hurtful," "harmful," with other synonymous terms. The New Century Dictionary defines it as "harmful or injurious to health or physical well being; deleterious; unwholesome." We think it was sufficiently defined in plaintiff's Instruction 1.

██ VI. Error is assigned in the admission of certain testimony as follows: Defendant called as its witness a doctor who had examined plaintiff at the instance of the Maryland Casualty Company a month or so after plaintiff left defendant's employment and had made a written report to the company. He had before him while testifying a copy of that report and while he did not read from it it is apparent that he was using it and in effect testifying from it in his examination in chief. Without setting out his testimony in chief it is sufficient to say that it was favorable to defendant and unfavorable to plaintiff. Some rather significant facts mentioned in the report which were more favorable, or at least less unfavorable, to plaintiff than others

there chronicled were not mentioned to the jury by the witness in his testimony in chief. Plaintiff then on cross-examination asked the witness to whom the report had been made and who had paid for the examination. Defendant objected. The court then, out of the hearing of the jury, heard defendant's objections which were on the ground that the revelation of the name of the casualty company would be incompetent, irrelevant and immaterial, tending to prove no issue and prejudicial to defendant. Defendant offered to admit that the witness "is called and is being paid by the defendant in this hearing," but objected to revelation of the name of the insurance company because immaterial, the fact that the witness was being called and paid by defendant being sufficient to disclose his possible interest, and further that "the insurance company has a policy involved in the sum of ten thousand dollars, whereas the suit in question is for fifty thousand dollars—the physical condition of the plaintiff is very serious and by the introduction of this evidence the rights of this defendant will be highly prejudiced."

The court overruled the objection and then, before the jury, the witness answered that he had made his report to the Maryland Casualty Company, which company had paid him for the report and for his examination of plaintiff. It is the admission of that testimony that is particularly challenged as erroneous. Defendant also objected to the introduction by plaintiff of the report itself as hearsay but since the witness had testified in chief from the report its admission on cross-examination cannot be considered error.

From defendant's statement in its objection that the Maryland Casualty Company had a policy "involved" and the fact that at no time either in the trial court or in its brief or argument in this court did it contend or suggest that said company was not in fact interested and conducting the defense, it may be assumed that said company was in fact a real, if not the record, contestant. [See Jablonowski v. Modern Cap Mfg. Co., 312 Mo. 173, 279 S. W. 89, and cases cited.] At least it appears that it was interested in the outcome of the suit to the extent of the policy it had issued to defendant. Defendant offered to admit that the witness "is called and paid by the defendant in this hearing" but it did not admit and could not truthfully have admitted that it had procured and paid for the examination and the *report* from which the witness was testifying and which on cross-examination he said (naturally) he stood by. We think his relationship to the parties in interest at the time he made the written report from which, largely at least, he testified, was a matter which the jury was entitled to know in order properly to weigh his testimony. Under somewhat similar facts in Snyder v. Wagner Electric Mfg. Co., 284 Mo. 285, 310, 223 S. W. 911, quoted in Jablonowski v. Modern Cap Mfg. Co., supra, 312 Mo. l. c. 200, 279 S. W. 89, it was said:

674

" 'It is not suggested, either in brief or in oral argument of counsel, that a casualty insurance company is not taking the burden of the defense of this case, as it has the perfect right to do  .  .  .  but in the trial of such cases upon the merits the jury is entitled to know everything that affects the credibility of witnesses and the weight to be given their testimony, including their interest not only in the subject-matter, but in the parties who are to profit or lose by the verdict. This goes not only to contractual relations with reference to the subject-matter of their testimony, but to their friendships and enmities  .  .  .' "

In the Jablonowski case evidence of this character was held relevant and admissible as impeachment evidence. In this case there were some inconsistencies between the witness' testimony in chief and the facts stated in the report from which he was testifying. But while proof of the identity of the insurance company to which the report was made may not have been competent as impeachment we are inclined to think that it was competent under the circumstances of this case upon the principle announced in Snyder v. Wagner Elec. Mfg. Co., supra. Moreover, we think it was not prejudicial to defendant. The verdict was only $10,000, a moderate sum in view of the evidence as to plaintiff's injury. We find nothing in the record to indicate passion or prejudice on the part of the jury. The verdict is supported by substantial evidence. In view of all of which we hold that the admission of the evidence in question does not justify reversal of the judgment.

VII. There was considerable evidence relative to the construction of the sand blast room and the ventilating system and equipment thereof, and appellant complains that it was not permitted to show that it was similar in those respects to such rooms in other factories. There were allegations in plaintiff's petition to the effect that plaintiff was not furnished a reasonably safe place in which to work but that issue was not submitted to the jury as a ground of recovery. The evidence as to construction, ventilating equipment, etc., had a bearing upon the question of whether or not there was dust in harmful quantities in the room. On that issue it could not matter whether the construction was similar to that of other sand blast rooms or not. Since the issue of a reasonably safe place was not submitted, defendant could not have been prejudiced by the exclusion of its proffered evidence on that question.

There are some other complaints, rather indefinitely stated, relative to the admission and rejection of evidence, which we deem unnecessary to discuss. In our opinion they are without substantial merit. We find no reversible error in the record. The judgment of the circuit court is affirmed. Westhues and Fitzsimmons, CC., concur.

PER CURIAM:—The foregoing opinion by Cooley, C., is adopted as the opinion of the court. All of the judges concur.