STATE of Missouri, ex rel. John ASH-CROFT, Attorney General of Missouri, and The Missouri Department of Labor and Industrial Relations, Division of Labor Standards, Plaintiff-Respondent,

and

International Brotherhood of Electrical Workers, Local 124, Plaintiff-Intervenor-Respondent,

v.

CITY OF SEDALIA, Mo., a Municipal Corporation, et al., Defendant-Appellant,

and

Medallion Electric Co., Defendant-Intervenor-Appellant.

No. WD 31837.

Missouri Court of Appeals, Western District.

Dec. 15, 1981.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied Jan. 19, 1982.

Applications to Transfer Denied March 16, 1982.

Alvin D. Shapiro, Stephen P. Dees, Stinson, Mag & Fizzell, Kansas City, for defendant-appellant.

John Ashcroft, Atty. Gen., Brenda Farr Engel, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

Before KENNEDY, P. J., and SHANGLER and SOMERVILLE, JJ.

SOMERVILLE, Chief Judge.

The State of Missouri, ex rel. John Ashcroft, Attorney General of Missouri, and The Missouri Department of Labor and Industrial Relations, Division of Labor Standards (hereinafter State) brought suit pursuant to Section 290.335, RSMo 1978, to enjoin the City of Sedalia (hereinafter City) from "further work or payments" on an industrial development project financed by industrial revenue bonds issued by the City under authority of Art. VI, § 27, Constitution of Missouri.[1]

The State predicated its right to injunctive relief on the City's failure to comply with the Prevailing Wage Act, Section 290.-210 et seq., RSMo 1978, in connection with work performed to carry out the industrial development project. More particularly, the State pleaded that the City failed to request the Missouri Department of Labor and Industrial Relations, Division of Labor Standards, to determine the prevailing rates of wages and otherwise comply with

---

1. Art. VI, § 27, Constitution of Missouri, insofar as here relevant, reads as follows: "Any city or incorporated town or village in this state, by vote of a majority of the qualified electors thereof voting thereon, and any joint board, commission, officer or officers established by a joint contract between municipalities or political subdivisions in this state, by vote of a majority of the qualified electors voting thereon in each of the municipalities or political subdivisions, may issue and sell its negotiable interest bearing revenue bonds for the purpose of paying all or part of the cost of purchasing, construction, extending or improving any of the following: . . . (2) plants to be leased or otherwise disposed of pursuant to law to private persons or corporations for manufacturing and industrial development purposes, including the real estate, buildings, fixtures and machinery . . . the principal and interest of the bonds to be payable solely from the revenues derived by the municipality or by the cooperating municipalities or political subdivisions from the operation of the utility or the lease of the plant. . . ."

the provisions of Section 290.250, RSMo 1978.[2]

The industrial development project involved purchase of a building and surrounding acreage by the City which it then leased to Gardner-Denver Company to renovate (by way of improvements and the installation of fixtures and machinery) and occupy for the purpose of manufacturing rotary screw compressors. The trial court granted the injunctive relief sought by the State but stayed its effective date pending an appeal by the City.

An issue of statewide interest and importance, alongside which all peripheral issues pale into obscurity, is at stake on appeal. Does the Prevailing Wage Act, Section 290.-210 et seq., RSMo 1978, apply to an industrial development project consisting of improvements to and the installation of fixtures and machinery in an existing building owned by a municipality and leased to a private corporation, to be paid for from the proceeds of industrial revenue bonds, where work on the project is being performed by contractors under contracts let by the private corporation? The facts surrounding this admittedly knotty issue are neither complex or unduly prolix. Essentially, the salient facts upon which this issue pivots are found in various exhibits introduced by the parties. Testimony of witnesses called by the respective parties bears minimally, if at all, on the dispositive issue.

Pursuant to Art. VI, § 27, Constitution of Missouri, and Sections 100.010–100.200, RSMo 1978,[3] the City obtained approval of the project and the issuance of industrial revenue bonds to finance it from the Division of Commerce and Industrial Development, State of Missouri; thereafter, the following proposal was submitted at a special election held by the City and approved by a majority of the voters:

"Shall the City of Sedalia, Missouri, issue its industrial revenue bonds to the amount of $6,530,000 for the purpose of purchasing and improving an industrial plant to be leased and otherwise disposed of to Gardner-Denver Company, a Delaware corporation, for manufacturing and industrial development purposes, including real estate, buildings, fixtures, machinery and equipment, said bonds to be payable solely from the revenues derived from said project for industrial development and not to be a general obligation of said City."

Financing of the industrial development project with industrial revenue bonds was consummated, insofar as here deemed pertinent, by (1) a Lease Agreement between the City and Gardner-Denver Company, (2) a Bond Purchase Agreement between the City and Morgan Guaranty Trust Company

2. Section 290.250, RSMo 1978, as here pertinent, reads as follows:

"Every public body authorized to contract for or construct public works, before advertising for bids or undertaking such construction shall request the department to determine the prevailing rates of wages for workmen for the class or type of work called for by the public works, in the locality where the work is to be performed. The department shall determine the prevailing hourly rate of wages in the locality in which the work is to be performed for each type of workman required to execute the contemplated contract and such determination or schedule of the prevailing hourly rate of wages shall be attached to and made a part of the specifications for the work. The public body shall then specify in the resolution or ordinance and in the call for bids for the contract, what is the prevailing hourly rate of wages in the locality for each type of workman needed to execute the contract and also the general prevailing rate for legal holiday and overtime work.... The public body awarding the contract shall cause to be inserted in the contract a stipulation to the effect that not less than the prevailing hourly rate of wages shall be paid to all workmen performing work under the contract.... It shall be the duty of such public body awarding the contract, and its agents and officers, to take cognizance of all complaints of all violations of the provisions of sections 290.210 to 290.340 committed in the course of the execution of the contract, and, when making payments to the contractor becoming due under said contract, to withhold and retain therefrom all sums and amounts due and owing as a result of any violation of sections 290.210 to 290.340...."

3. Chapter 100, RSMo 1978, is captioned "Industrial Development" and Sections 100.010—100.200 are set forth under a subheading captioned "Industrial Development Projects—Bonds".

of New York, purchaser of the industrial revenue bonds, (3) an Indenture of Trust between the City and The First National Bank of Chicago, trustee for the bondholders, and (4) a Guaranty Agreement between Gardner-Denver Company and The First National Bank of Chicago, trustee for the bondholders.

Neither the legality of the industrial revenue bonds issued by the City nor the legality of the various documents employed to consummate financing of the industrial development project with the proceeds of said industrial revenue bonds has been questioned on appeal. The cardinal issue, as previously noted, centers upon the applicability vel non of the Prevailing Wage Act, Section 290.210 et seq., RSMo 1978, to the industrial development project.

For purposes of expediency, germane provisions of the documents heretofore specifically mentioned will be compositely paraphrased. Accordingly, the following is reflected by those provisions deemed to warrant consideration. The tract of land and building situate thereon to be renovated was leased by the City to Gardner-Denver Company for a term of years in consideration of biannual rental payments sufficient to pay the interest on and retire the industrial revenue bonds upon maturity. Upon expiration of the lease and payment in full of any outstanding industrial revenue bonds, the City was obligated to sell and Gardner-Denver Company was obligated to purchase the tract of land and completed facilities for the sum and amount of One Thousand Dollars. In the Lease Agreement, Gardner-Denver Company was broadly designated "as the agent" of the City to renovate the existing building and install fixtures and equipment to adapt it for the purpose of manufacturing rotary screw compressors. The sense in which the term "agent" was used was neither explicated nor defined in the "Definitions" section or elsewhere in the Lease Agreement. Nor was such done in any of the other documents. It was clearly delineated, however, that Gardner-Denver Company was obligated to renovate the existing building and install all requisite fixtures and equipment

and do so in accordance with its own plans and specifications. Contracts with various contractors who were to perform work on the project were to be let by Gardner-Denver Company. It is noted that only one contract of this type was contained in the record, and it was let merely by and in the name of Gardner-Denver Company. Gardner-Denver Company, within the limits of the proceeds of the industrial revenue bonds issued, was to be reimbursed by the trustee designated in the Indenture of Trust for all sums which Gardner-Denver Company expended in carrying out the industrial development project. Reimbursements were to be made by the trustee designated in the Indenture of Trust upon written orders from authorized representatives of Gardner-Denver Company. The proceeds of the industrial revenue bonds were held by the trustee designated in the Indenture of Trust and, to the extent required to defray the costs of the industrial development project, were disbursed to Gardner-Denver Company by way of reimbursement for costs incurred by it in carrying out the project. None of the bond proceeds were to be disbursed to the City. After Gardner-Denver Company was reimbursed for all costs incurred by it in carrying out the project, any excess industrial revenue bond proceeds were to be used by the trustee to retire the bonds. Gardner-Denver Company, by virtue of an assignment by the City, was to pay all rentals due under the lease to the trustee designated in the Indenture of Trust rather than to the City. The various documents meticulously guard against the City incurring any general obligation (Art. VI, § 27, Constitution of Missouri) or any pecuniary liability (Section 100.150, RSMo 1978) with respect to the industrial revenue bonds or any liability for costs incurred by Gardner-Denver Company in carrying out the industrial development project. Gardner-Denver Company, and it alone, was liable for costs incurred in connection with the industrial development project which exceeded the proceeds derived from the sale of the industrial revenue bonds. Gardner-Denver Company, and it alone, personally

guaranteed payment of all amounts due the holders of the industrial revenue bonds. Collectively, the various documents neither contemplate nor suggest that contractors performing work on the project under contracts let by Gardner-Denver Company were to look, either in whole or in part, to anyone other than Gardner-Denver Company for payment.

The judgment of the trial court was accompanied by findings of fact and conclusions of law. In essence, the trial court found and concluded that the industrial development project in question fell within the definition of a "public works" as defined in Section 290.210(7) of the Prevailing Wage Act, RSMo 1978, and was, therefore, subject to all the provisions of the Prevailing Wage Act by reason of the statutorily declared policy of the State of Missouri set forth in Section 290.220, RSMo 1978.

Section 290.210, RSMo 1978, is captioned "Definitions". Paragraph (7) thereof defines "public works" as follows:

"(7) 'Public works' means all fixed works constructed *for public use or benefit or paid for wholly or in part out of public funds.* It also includes any work done directly by any public utility company when performed by it pursuant to the order of the public service commission or other public authority whether or not it be done under public supervision or direction or paid for wholly or in part out of public funds when let to contract by said utility. It does not include any work done for or by any drainage or levee district." (Emphasis added.) [4]

Section 290.220, RSMo 1978, is captioned "Policy declared" and reads as follows:

"It is hereby declared to be the policy of the state of Missouri that a wage of no less than the prevailing hourly rate of wages for work of a similar character in the locality in which the work is performed, shall be paid to all workmen employed by or on behalf of any public body engaged in public works exclusive of maintenance work."

In drawing its conclusions of law, the trial court empirically concluded that increased employment and stimulation of the community's economy would inevitably flow from the industrial development project.[5] The trial court further reasoned that "public benefit" and "public purpose" were synonymous terms and cited, among other cases, *State ex rel. Jardon v. Ind. Dev. Auth., etc.,* 570 S.W.2d 666, 675 (Mo. banc 1978), holding that "improved employment and stimulation of the economy serve essential public purposes." The trial court syllogistically concluded that the industrial development project constituted a "public benefit" and, hence, fell within the definition of "public works" as defined in Section 290.210(7), RSMo 1978. In its clearly articulated findings of fact and conclusions of law, the trial court, in light of the statutorily declared policy of this state enunciated in Section 290.220, RSMo 1978, further concluded that the industrial development project fell within the purview of the Prevailing Wage Act. The trial court was acutely aware of the statewide significance of the apical issue and candidly observed that it was one which "must be hit head on by the Appellate Courts of this State so that uncertainty may be finally resolved."

■ This court respectfully concludes that under the particular facts at hand resolution of the issue in this case entails more than simply determining that the industrial development project fell within the statutory policy declaration contained in Section 290.220, RSMo 1978, by reason alone that it constituted a "public benefit", i.e., a "public

---

4. As originally enacted, Laws 1957, p. 574, § 1, Section 290.210(7) did not contain the phrase "or benefit". Section 290.210(7) was amended, Laws 1969, p. 403, § 1, and as amended includes the phrase "or benefit". It is noted that an amendment to a statute is intended to have some effect as the legislature will not be charged with having done a meaningless act.

*State ex rel. Thompson-Stearns-Roger v. Schaffner,* 489 S.W.2d 207, 212 (Mo.1973).

5. By the same token, increased employment and economic stimulation would flow in equal measure from the project if it had been wholly a private undertaking without resort to industrial revenue bonds.

works" within the statutory definition set forth in Section 290.210(7), RSMo 1978. Any other conclusion would be tantamount to rejecting the following portion of Section 290.220, RSMo 1978, "paid to all workmen *employed by or on behalf of any public body*" (emphasis added) as inoperative and meaningless. To succumb to such a result would do violence to certain well established rules of statutory construction. It is presumed that every word, clause, sentence and provision of a statute was intended by the legislature to have effect and be operative. *State ex rel. St. Louis Die Casting Corporation v. Morris*, 358 Mo. 1170, 219 S.W.2d 359, 362 (1949); and *Graves v. Little Tarkio Drainage Dist. No. 1*, 345 Mo. 557, 134 S.W.2d 70, 78 (1939). Conversely, it will not be presumed that the legislature inserted idle verbiage or superfluous language in a statute. *Dodd v. Independence Stove & Furnace Co.*, 330 Mo. 662, 51 S.W.2d 114, 118 (1932); *State ex rel. Kelsey v. Smith*, 335 Mo. 1125, 75 S.W.2d 832, 834 (Banc 1934); *Bussmann Manufacturing Co. v. Industrial Commission, Division of Employment Security*, 335 S.W.2d 456, 460 (Mo. App.1960); and *State ex rel. May Department Stores Company v. Weinstein*, 395 S.W.2d 525, 527 (Mo.App.1965).

■ Section 290.220, RSMo 1978, clearly prescribes two criteria for determining whether the Prevailing Wage Act is applicable to the industrial development project involved in this appeal. One, the industrial development project must constitute a "public works", and two, the industrial development project must involve "workmen employed by or on behalf of . . . [a] public body engaged in public works." Section 290.220, RSMo 1978. Assuming, arguendo, that the industrial development project constituted a "public works" as statutorily defined in Section 290.210(7), RSMo 1978, thereby meeting one criterion for determining the applicability of the Prevailing Wage Act as prescribed by Section 290.220, RSMo 1978, it remains to be determined whether the second criterion has been met.

■ This court holds that under the particular facts of this case the second criterion has not been met and therefore the Prevailing Wage Act is inapplicable to the industrial development project which is the focal point of this appeal. This holding is premised on the synthesis of *Wring v. City of Jefferson*, 413 S.W.2d 292 (Mo. banc 1967), and *City of Joplin v. Industrial Commission of Missouri*, 329 S.W.2d 687 (Mo. banc 1959).

In *Wring v. City of Jefferson, supra*, a number of taxpayers brought suit to enjoin the *City of Jefferson* from carrying out an industrial development project financed by industrial revenue bonds pursuant to Art. VI, § 27, Constitution of Missouri. The judgment of the trial court granting the injunctive relief prayed for was reversed on appeal in a four to three decision. The project in *Wring* involved construction of an industrial plant leased to Interco Incorporated. Two of the principal issues in *Wring* were (1) whether the City of Jefferson was "obliged by statutory law [Sections 71.840, 71.843, and 71.847, Mo.Supp.1965 [6]]

---

**6.** Currently Sections 100.160, 100.170, and 100.180, RSMo 1978, respectively.

Section 100.160, RSMo 1978, reads as follows: "When funds have been received by the municipality for the carrying out of the project, the municipality shall purchase, construct, extend or improve the facilities as provided by the plan."

Section 100.170, RSMo 1978, reads as follows: "Whenever the approved plan for the project calls for the construction, improvement or extension of facilities, the municipality shall enter into a contract for the purpose. All contracts shall be let on competitive bidding to the lowest and best bidder. Notice of the letting of the contracts shall be given in the manner provided by section 8.250, RSMo."

Section 100.180, RSMo 1978, reads as follows: "The municipality shall have the authority to lease to private persons, partnerships or corporations the facilities purchased, constructed or extended by the municipality for manufacturing and industrial development purposes. In the event that the facility has been financed by revenue bonds, the rental shall be sufficient to meet the interest and sinking fund requirements on the bonds. The lease shall contain such other terms as are agreed upon between the municipality and the lessee, provided that such terms shall be consistent with the other provisions of sections 100.010 to 100.200."

to ... [be] a party directly to the contract for the construction of the industrial plant", and (2) "to let the contract" on competitive bidding "to the lowest and best bidder". 413 S.W.2d at 297. The lease between the *City of Jefferson* and Interco provided that Interco was to construct the industrial plant according to plans approved by the *City of Jefferson* and be reimbursed by the *City of Jefferson* from the proceeds of the industrial revenue bonds. 413 S.W.2d at 297. Although none of the terms of the lease entered into between the *City of Jefferson* and Interco were set forth verbatim, the court acknowledged that the lease provided that Interco was to act as "agent or representative" of the *City of Jefferson* in constructing the industrial plant. 413 S.W.2d at 298. The industrial plant was leased by the *City of Jefferson* to Interco at rentals sufficient to retire the industrial revenue bonds and Interco was given an option to purchase the industrial plant for the sum of one dollar when the industrial revenue bonds were retired. 413 S.W.2d at 291. The facts in *Wring* and those in this case are sufficiently analogous that the majority opinion in *Wring*, in conjunction with *City of Joplin v. Industrial Commission of Missouri, supra,* which will subsequently be discussed in detail, pave the way for deciding this appeal.

In an exhaustive, complex opinion the majority in *Wring* held, 413 S.W.2d at 298, 299, 300 and 301, as construed by the dissenting opinion, 413 S.W.2d at 302, that the legal format employed by the *City of Jef-*

ferson* and Interco to crystalize the industrial development project being financed by industrial revenue bonds placed the *City of Jefferson* in the role of a "purchaser" as opposed to placing it in the role of constructing the project.[7] The rationale employed by the majority in *Wring* takes the following course. "There is authority to support the defendants' contention that the essential nature of this transaction is a purchase of the building by the City on an installment basis as it is erected and payments made ... [t]here is also authority for the proposition that in the construction of an industrial facility financed by revenue bonds the municipality may act through an agent or representative as provided in the proposed lease agreement and that statutes such as §§ 71.840 and 71.847 do not compel a construction that the municipality itself must directly construct the building or execute the building contract as a party thereto." 413 S.W.2d at 298. Notwithstanding the fact that the lease between the *City of Jefferson* and Interco provided that Interco was to act as "agent or representative" of the *City of Jefferson* in constructing the industrial development project, the majority in *Wring*, as perceived by this court, concluded, as hereinafter noted, that said lease provision signified or connoted that the *City of Jefferson*, in the role of purchaser, merely "sponsored" the project, as opposed to signifying or connoting a relationship governed by principles of the law of agency.[8] "It would be entirely out of har-

---

7. *Wring v. City of Jefferson*, 413 S.W.2d 292, 302 (dissenting opinion): "The first basis advanced in the principal opinion for upholding the lease agreement between the City and Interco is that this transaction did not involve construction by the City at all but rather was simply an installment purchase by the City of the facility 'as it is erected and payments made.' This portion of the opinion is couched in language that 'there is authority to support the defendant's contention' that this was a purchase by the City of the building on an installment basis. I interpret this as a holding that this was an installment purchase, not a mere discussion of what it might have been. If it were the latter, of course, it would not provide any basis for the result reached."

8. If this court has misconstrued the majority opinion in *Wring* in the sense mentioned, the following hypothetical examples relied upon by the majority would not appear to be entirely apropos: "If we construe § 71.843 as requiring the City in the case of a revenue bond project to enter into the usual construction contract without limitation as to the funds from which the agreed contract price will be paid, one of two things will happen. If the contract price is *less* than the debt limitation imposed by §§ 26(a) and 26(b) of Art. 6, there will be a valid contract which creates a debt or obligation *separate and apart* from the revenue bond obligation ... If the contract price *exceeds* the debt limitation imposed by §§ 26(a) and 26(b), then the contract is ultra vires and void ab initio because a proposal to incur a *debt* of this magnitude must be submitted to an elec-

mony with the character and all attributes of revenue bonds if the intention of § 71.-843 was to require a municipality in *sponsoring* the erection of a specialized industrial plant to become a party to the contract for all purposes and to let the contract on competitive bidding to the lowest and best bidder. It would be contrary to the central purpose of permitting the issuance of this kind of bonds." (Emphasis added.) 413 S.W.2d at 299. "The construction of §§ 71.840, 71.843 and 71.847 urged by the respondents would impair and restrict the constitutional right of the City under [Art. VI] § 27 in that these sections would compel the City to 'enter into a contract' and 'to construct' the facility in derogation of the City's constitutional right to issue and sell revenue bonds 'for the purpose of *paying all* or part of *the cost* of purchasing [or] constructing' the facilities specified. Emphasis added. This portion of [Art. VI] § 27 has been held to be self-enforcing." 413 S.W.2d at 300. "The language of [Art. VI] § 27 and its constitutional context indicates an intention to avoid any general obligation or liability being imposed on the city in connection with the industrial plant proposed.... We do hold under controlling constitutional provisions and existing law that §§ 71.840, 71.843, and 71.847 have no legal standing *to require a municipality itself to construct or to enter into the construction contracts for a project financed as in this case by industrial revenue bonds* and to let such contracts to competitive bidding to the lowest and best bidder. The contention that the lease agreement fails to comply with §§ 71.840, 71.843 and 71.847 and is invalid for that reason is denied." (Emphasis added.) 413 S.W.2d at 301.

■ This court stands convinced that two conclusions, albeit subliminal in certain respects, may be drawn from the majority opinion in *Wring*. First, a municipality may either be directly involved in carrying out an industrial development project financed by industrial revenue bonds issued pursuant to Art. VI, § 27, Constitution of Missouri, or it may divorce itself from active participation in carrying out such an industrial development project and limit its involvement to the issuance of industrial revenue bonds for the purpose of financing the project. Second, if the legal format employed discloses that a municipality has opted to follow that latter course, designation of the industry obligated to carry out the project in a lease as "agent" of the municipality carries the connotation of sponsorship rather than the connotation of a relationship governed by general principles of agency.

When the pervasive logic undergirding the majority opinion in *Wring* and the closely analogous facts therein are superimposed on the facts and critical issue involved in this appeal, this court is impelled to hold that the legal format utilized by the City and Gardner-Denver Company to carry out the industrial development project at hand did not involve "workmen employed by or on behalf of" the City within the purview of the statutorily declared policy of this state set forth in Section 290.220, RSMo 1978, and therefore the project was not subject to the Prevailing Wage Act.

■ The above conclusion is further buttressed by *City of Joplin v. Industrial Commission of Missouri, supra,* holding that the Prevailing Wage Act, although applicable to employees of private contractors working on a municipal sewer project, was inapplicable to city employees working on the project. In so holding, the court italicized the following portion of Section 290.230.1, Laws 1957, p. 574, § 3 [now Section 290.-230.1, RSMo 1978]: "*Only such workmen as are directly employed by contractors or subcontractors in actual construction work on the site of the building or construction job shall be deemed to be employed under public works.*" The court then proceeded to

tion and be approved by two-thirds of the qualified electors voting thereon.... On the other hand, if we construe § 71.843 as authorizing or directing the City to enter into a contract limiting and confining the source of payment to the special fund realized from the sale of revenue bonds, we would be reading into the statute an exception or limitation not expressed or warranted by its broad language." 413 S.W.2d at 299, 300.

point out that the italicized portion of Section 290.230.1 appeared to be in direct conflict with Section 290.220, Laws 1957, p. 574, § 2 [now Section 290.220, RSMo 1978], which is now reiterated for purposes of clarity and emphasis: "It is hereby declared to be the policy of the *State of Missouri* that a wage of no less than the prevailing hourly rate of wages for work of a similar character in the locality in which the work is performed, shall be paid to all workmen employed by or on behalf of any public body engaged in public works exclusive of maintenance work." The court in *City of Joplin* then held that "it would seem from the entire context of the Act [Prevailing Wage Act, Section 290.220, et seq.], emphasizing contracts for public works and duties of contractors, that the positive language of this italicized portion [Section 290.230.1] expresses the true intent of the legislature and should control its application." 329 S.W.2d at 692. In this same context, the court stated that "[f]urthermore, the legislative history of the Act [Prevailing Wage Act] indicates *an intent to limit its application to employees of contractors constructing public works on contracts with public bodies.*" (Emphasis added.) 329 S.W.2d at 692. Although the instant case and *City of Joplin* are factually distinguishable, the broad legislative intent ascribed to the Prevailing Wage Act in *City of Joplin* supports this court's resolution of the salient issue here present on appeal.

This court has no inclination, nor is there any need, to launch into an academic discussion of conflicting or competing public policies which are the genesis of industrial development projects financed by industrial revenue bonds on the one hand and the Prevailing Wage Act on the other hand. It suffices to note that financing industrial development projects with industrial revenue bonds springs from a public policy conceived to attract new industry to local communities, while the Prevailing Wage Act springs from a public policy conceived to insure payment of prevailing wage rates to workmen employed by public bodies on public works. Under the facts of this case, however, the conflicting or competing pub-

lic policies mentioned stop short of coming into head-on collision. *Gregory v. City of Lewisport,* 369 S.W.2d 133 (Ky.1963), *Daniels v. City of Fort Smith,* 594 S.W.2d 238 (Ark.1980), and *Zickuhr v. Bowling,* 97 Ill. App.3d 534, 53 Ill.Dec. 65, 423 N.E.2d 257 (1981), cited by appellant, have not been relied upon by this court in reaching its decision. Although these decisions from states bordering *Missouri* hold that their respective Prevailing Wage Acts are inapplicable to industrial development projects financed by industrial revenue bonds, their respective Prevailing Wage Acts, insofar as here pertinent, limit their application to public works constructed for "public use" and do not define public works as including projects constructed for "public use or benefit" as defined in Section 290.210(7), RSMo 1978. Moreover, these decisions do not reach the pivotal issue upon which this case turns, i.e., whether workmen engaged on the industrial development project carried out by Gardner-Denver Company were employed "by or on behalf" of the City as prescribed by Section 290.220, RSMo 1978.

As the City was neither a party to nor required to be a party to contracts let by Gardner-Denver Company to effect the industrial development project, *Wring v. City of Jefferson, supra,* workmen on the project were not employed "by or on behalf" of the City as delineated in Section 290.220, RSMo 1978, *City of Joplin v. Industrial Commission of Missouri, supra.* At the risk of being unduly redundant, the industrial development project which invoked this appeal did not fall within the statutorily declared policy of this state contained in Section 290.220, RSMo 1978, regarding applicability of the Prevailing Wage Act.

Judgment reversed.

All concur.